## STATE v. MIRIAM RUTH CURRIE.

126 N. W. (2d) 389.

February 14, 1964—No. 38,913.

*Earle T. Anderson, Jr.,* and *Rollin J. Whitcomb,* for appellant.

*Walter F. Mondale,* Attorney General, *Charles E. Houston,* Solicitor General, *George M. Scott,* County Attorney, and *Gerard W. Snell,* Assistant County Attorney, for respondent.

KNUTSON, CHIEF JUSTICE.

Defendant was convicted of forgery in the second degree and appeals from the judgment entered pursuant thereto.

Defendant was charged by information with having, on March 30, 1962, in the city of Minneapolis, aided and abetted by Sandra Joanne Heldt and Merle Cook, "wilfully, unlawfully, wrongfully, knowingly and feloniously, with intent to defraud, utter, dispose of and put off as true to and upon Clifford Lyle McKenzie, doing business as Music Bar, a certain false and forged instrument in writing commonly known as and called a draft," in the amount of $127, drawn on Minnesota Wool Growers Association.

For an understanding of the case, it is necessary to relate briefly the association of the three individuals charged. Defendant was caretaker of a building owned by her mother-in-law, in which others rented rooms. Prior to the date of the alleged offense, Sandra Heldt had rented quarters from defendant but had left sometime before that date, apparently because of a dispute which arose between them. There was evidence that the dispute was due to the fact that Sandra Heldt was friendly with defendant's husband, but in any event it is admitted that they did have an argument and that Sandra Heldt left. At that time, she owed some rent for the quarters which she had been occupying.

Merle Cook also lived in the building. She worked for defendant, earning her board and keep and in addition $30 per week. She acted as babysitter for defendant's 3-year-old son and did housework.

Defendant and her husband were having trouble and at times he was away. At other times, they were reconciled and he lived at home.

Prior to the occurrence upon which the conviction is based, Sandra Heldt was employed by North Central Wool Marketing Corporation, which for the purposes of this opinion may be considered the same organization as Minnesota Wool Growers Association, the payor in the drafts involved. It is conceded that while so employed Sandra stole two books, each containing 25 blank drafts drawn on her employer. After she had stolen the first book she called defendant and asked to be met near her place of employment. Sandra and defendant then drove to defendant's home and Sandra told defendant that she had stolen a book of blank drafts and asked her whether she was interested in making some money in helping to cash them. Sandra then showed defendant how to fill in the drafts, using the name of Mary Katherine Gudgell on some and that of Carol June Kordell on the others as payee. The drafts were filled in for amounts varying from $57 to $144. Defendant claims that when she had filled in one book and about half of the other book her 3-year-old son came into the room and she realized she had too much to lose by going through with the plan so she informed Sandra Heldt that she wanted nothing more to do with it and asked her to take the drafts out with some trash and burn them.

Merle Cook was present during all of this time and completely cor-

roborates defendant in these respects. Sandra Heldt testified that she did take some trash out, as defendant says she asked her to do, but that the drafts were not in the trash. She said that defendant was supposed to cash a book of the drafts for her, but she later admitted that Merle Cook actually cashed all the drafts that were passed. Altogether 34 or 35 drafts were passed and about $4,250 was realized out of them. Sandra Heldt testified that she received only $200 from defendant, but Merle Cook said that she herself cashed the drafts and turned the money over to Sandra; that they then divided the money and she received slightly over $2,000. She testified that defendant received no part of the loot.

Sandra Heldt had no automobile. Merle Cook testified that she had the use of defendant's car whenever she wanted it and that it was this car that was used while cashing the drafts, Sandra being with her during part of the time. She said that defendant had no knowledge of the fact that her car was being used to cash the drafts or that they had not been destroyed as she requested. The draft upon which the charge is based was cashed in Music Bar with one Clifford Lyle McKenzie. He testified that after he had cashed the draft he became suspicious and took down the license number of the car. It turned out that this car was registered in the names of Leonard Currie and Miriam R. Currie. McKenzie identified Merle Cook as the person who had passed the draft, and he said that he saw a man in the car which she entered after cashing the draft. He was unable to identify the man who was present in the car.

In the process of cashing a draft in a Red Owl store, Merle Cook's picture was taken. It was later shown on television, and when she saw it she left for Chicago. She later returned for fear that she might be guilty of a Federal offense and gave herself up to the police.

At the time of the trial of defendant, both Sandra Heldt and Merle Cook had been convicted of forgery based on this same series of events. Merle Cook had been sentenced, but, even though several months had elapsed between Sandra's trial and defendant's trial, Sandra had not yet been sentenced.

On occasions, Merle Cook had used the name Mary Katherine Gud-

gell. She had found some kind of a learner's permit from Iowa in the name of Mary Katherine Gudgell in one of the apartments she was cleaning. The other name, Carol June Kordell, was taken from a driver's license that Sandra Heldt had obtained bearing that name. It was necessary to have identification in order to cash these drafts.

With respect to her claim that she withdrew before the commission of the crime, defendant testified that after she had filled out one book and about half of the other book her son came into the room and—

"A.   * * * I looked at Sandy and she had Jerise in her arms and I said, 'I can't do this.' I says, 'I have got more to lose than a few unpaid bills and so forth and so on.' I said, 'Take them and do with them whatever you want to do with them, just get rid of them.'

"Q.   Did you then give the checks to Sandy?

"A.   Yes, I did.

"Q.   Did Sandy take the checks from the premises?

"A.   She took them off the table and said she would burn them on the way down. I said, 'On the way down, why don't you burn the trash also?' So she took the waste basket and I know she had them in her hands.

*   *   *   *   *

"Q.   Did she return the waste basket?

"A.   No. We called her a cab and she said she would set it on the back steps and I could get it later.

"Q.   Did you find it later on the back steps?

"A.   Yes, I did."

With respect to this occurrence, Sandra Heldt testified:

"Q.   You don't recall her pushing the checks back to you and telling you to take them out of there?

"A.   No, I don't.

"Q.   You don't recall of leaving the residence by the back stairway, carrying the waste basket with the checks in it?

"A.   I took some trash out for her, but not with the checks in there, as far as I know.

"Q.   Not with the checks in it?

"A.   No.

"Q.   You did not remove those checks from that waste basket?

"A.   No, I did not."

It is admitted that the waste basket was later retrieved from the back stairs.

During the cross-examination of Merle Cook, she was asked whether she knew or was acquainted with Mary Katherine Gudgell or Carol June Kordell. She explained that she had a learner's permit from Iowa in the name of Mary Katherine Gudgell which she had found and that she had received the identification in the name of Carol June Kordell from Sandra Heldt. In pressing the matter further, the prosecuting attorney asked these questions:

"Q.   Do you know who those two people are?

"A.   No.

"Q.   The defendant does, does she not?

"A.   I don't know.

"Q.   You know that she's done time with the two of them, don't you?"

Thereupon the court sustained an objection to this question, and later defendant's counsel moved for a mistrial on the ground that this question was highly prejudicial. Later in the cross-examination of defendant, who took the stand in her own behalf, the prosecuting attorney, again seeking to find out whether defendant was acquainted with the parties whose names were used as payees in the drafts, submitted these questions:

"Q.   All right. Do you know Mary Katherine Gudgell?

"A.   No, I don't.

"Q.   Do you know Carol June Kordell?

"A.   No, I don't.

"Q.   Do you know whom I could be confusing Mary Katherine Gudgell with?

"A.   No, sir, I don't.

"Q.   Were you arrested in the company of a Mary Katherine Gudgell on the—"

Thereupon objection was interposed and was overruled, and the witness answered "Yes." Counsel then went on:

"Mr. Snell: —at the Andrew's Hotel?

"The Witness: Yes, it was Merle Cook using that identification."

Neither of these questions was pursued any further to show what, if anything, defendant had been arrested or supposedly served time for. The main thrust of this appeal is based on the claim that asking these questions improperly prejudiced the jury so that defendant could not have a fair trial.

At the outset it must be apparent that the conviction of defendant rests entirely upon the testimony of Sandra Heldt, an accomplice, with the exception of the facts that defendant's car was used while the drafts were being cashed and that defendant admittedly was originally involved in the episode and actually did fill in a book and a half of checks or drafts. Prior to the court's instruction to the jury, it was stated:

"Mr. Snell [assistant county attorney]: I think at this time that we should make a record of the point that the defense agrees that the only issue in this case is a matter of whether or not the defendant withdrew from this conspiracy to utter these drafts.

"The Court: You do not mean conspiracy. You mean a planned scheme or arrangement to utter the drafts, is that what you mean?

"Mr. Snell: Yes, sir.

"Mr. Anderson: That is agreeable.

"Mr. Snell: The Court in its instructions will take that into consideration so that it is not necessary to go into the statute defining forgery and so forth.

"Mr. Anderson: All right. No objection."

■ It is apparent that if the testimony of defendant and Merle Cook is true the conviction of defendant should not stand. That a person who originally is a participant in a scheme or plan to commit a crime may withdraw before the actual commission of the crime, and thereby be absolved of criminal responsibility, is well established. In State v. Peterson, 213 Minn. 56, 59, 4 N. W. (2d) 826, 827, we said:

"One who has procured, counseled, or commanded another to commit a crime may withdraw before the act is done and avoid criminal responsibility by communicating the fact of his withdrawal to the party who is to commit the crime."

In that opinion, a number of cases, including Hyde v. United States, 225 U. S. 347, 32 S. Ct. 793, 56 L. ed. 1114, Ann. Cas. 1914A, 614, are discussed.[1]

█ The state contends that the question asked of Merle Cook— whether defendant had not "done time" with the persons whose names were used as payees in the drafts—was asked for the purpose of "identification," but it is obvious that the effect of the question was to impugn the character of defendant by leaving the implication with the jury that she was a police character. No showing was made as to whether she supposedly had been convicted of a felony, a violation of the city ordinance, or what; and there was no attempt to make such showing. It is well settled that the character of a defendant may not be attacked in a criminal prosecution by the prosecutor until the defendant puts it in issue.[2]

Nor can the state be permitted to deprive a defendant of a fair trial by means of insinuations and innuendoes which plant in the minds of the jury a prejudicial belief in the existence of evidence which is otherwise inadmissible.[3]

---

[1]The rule is expressly recognized in the Criminal Code of 1963. L. 1963, c. 753, § 609.05, subd. 3, reads: "A person who intentionally aids, advises, hires, counsels, or conspires with or otherwise procures another to commit a crime and thereafter abandons his purpose and makes a reasonable effort to prevent the commission of the crime prior to its commission is not liable if the crime is thereafter committed." It is also recognized with respect to an attempt to commit a crime in L. 1963, c. 753, § 609.17, subd. 3. See, also, 22 C. J. S., Criminal Law, § 94; 15 Am. Jur., Criminal Law, § 333.

[2]State v. Nelson, 148 Minn. 285, 181 N. W. 850; State v. Gress, 250 Minn. 337, 84 N. W. (2d) 616; City of St. Paul v. Harris, 150 Minn. 170, 184 N. W. 840; State v. McCorvey, 262 Minn. 361, 114 N. W. (2d) 703; Underhill, Criminal Evidence (5 ed.) § 192.

[3]State v. Haney, 219 Minn. 518, 18 N. W. (2d) 315; State v. Gress, 250 Minn. 337, 84 N. W. (2d) 616.

■ Even though the objection to the question was sustained by the court, the mere asking of a question which by innuendo may leave a prejudicial supposition as to the existence of facts that cannot be proved has frequently been held sufficiently damaging to require a new trial.[4]

If, as the state claims, the purpose was to ascertain whether defendant knew the persons whose names were used as payees in the drafts, it could have elicited that information equally as well by asking the witness whether she knew such persons without asking the prejudicial question involved here. The language used by the prosecutor is open to all kinds of prejudicial inferences.

■ Much the same can be said about the state's question propounded to defendant when she took the stand in her own behalf as to whether or not she had been "arrested in the company of a Mary Katherine Gudgell." When a defendant takes the stand as a witness, the state is not permitted to put in issue the defendant's character. The credibility of defendant's testimony may be subjected to the same tests as that of another witness with respect to convictions of a crime under Minn. St. 610.49.[5]

However, an arrest is not a conviction under this rule and is not admissible for impeachment or to attack the credibility of defendant's testimony.[6]

The court, in Lyons v. State, 32 Ala. App. 44, 21 So. (2d) 339, 340, aptly said:

"* * * there has never been any rule of evidence, or any law, to permit the State, as here appears, to offer evidence to the effect that the defendant had been formerly arrested by the State's witnesses, which of necessity would tend to cast undue opprobrium upon the ac-

---

[4]State v. Silvers, 230 Minn. 12, 40 N. W. (2d) 630; State v. Flowers, 262 Minn. 164, 114 N. W. (2d) 78.

[5]See, State v. Gress, 250 Minn. 337, 84 N. W. (2d) 616; State v. Markuson, 261 Minn. 515, 113 N. W. (2d) 346.

[6]State v. Renswick, 85 Minn. 19, 88 N. W. 22; State v. Bryant, 97 Minn. 8, 105 N. W. 974; State v. Larson, 171 Minn. 246, 213 N. W. 900; McCormick, Evidence, § 43, p. 90, note 4; 3 Wigmore, Evidence (3 ed.) § 980a.

cused, who in this case never offered himself as a witness. There is a wide distinction between the words arrest and conviction. Arrests may be unduly made by active and overzealous peace officers; or by biased and prejudiced officers."

From all that appears from the record in this case, the arrest, if there was one, may have been for a violation of a municipal ordinance or a highway traffic regulation. Even conviction of violating a municipal ordinance may not be shown for impeachment purposes.[7] Conviction of a traffic offense less than a felony is inadmissible under Minn. St. 169.94. Merely asking a question whether a defendant has pleaded guilty to violation of a state highway traffic regulation was held reversible error in Warren v. Marsh, 215 Minn. 615, 11 N. W. (2d) 528. If a conviction of such crime could not be shown, much less could a simple arrest be shown.

The rule is much the same as that with respect to an indictment. The mere fact that a person has been indicted by a grand jury may not be shown for impeachment purposes.[8]

The vice of such a question as defendant was asked, without more, is that the jury is left to infer that defendant may be a bad character because she had been arrested when, as a matter of fact, she may have been entirely innocent of any crime.

It is true that occasionally it is necessary to prove a matter ordinarily inadmissible in order to establish a fact relevant to the prosecution, but here it is hardly possible that it was necessary to show that defendant had been arrested in order to establish whether she knew Mary Katherine Gudgell or that defendant had furnished to Merle Cook the identification bearing that name which was used in cashing these drafts. Direct questions, without improper innuendoes, would have accomplished the same purpose.

■ The state argues that even if these questions were improper they were not prejudicial and that the state acted in good faith in

---

[7]Carter v. Duluth Yellow Cab Co. 170 Minn. 250, 212 N. W. 413; see, also, State v. Glazer, 176 Minn. 442, 223 N. W. 769.

[8]Brennan v. Minnesota, D. & W. Ry. Co. 130 Minn. 314, 153 N. W. 611, L. R. A. 1915F, 11; State v. Ronk, 91 Minn. 419, 98 N. W. 334.

asking them. At best, the evidence to sustain a conviction in this case is close. Improper questions impugning the character of defendant under these circumstances might well have been sufficient to lead the jury to believe the story of Sandra Heldt and disbelieve that of defendant and Merle Cook. Nor does the good faith of the prosecutor remove the sting from improper questions that are apt to prejudice the jury. In State v. Silvers, 230 Minn. 12, 22, 40 N. W. (2d) 630, 635, we said:

"* * * Good faith of the prosecuting attorney in asking improper questions is wholly irrelevant to the problem. Defendant's rights are as much jeopardized by a question asked in good faith as by one asked with a vicious purpose."

In view of these errors there must be a new trial. Defendant has not urged the insufficiency of the evidence, particularly with respect to corroboration of an accomplice to sustain the conviction, as grounds for relief. In view of our decision to grant a new trial, it might not be amiss to point out some troublesome aspects of the case that might arise again.

■ It is conceded that defendant did not actually cash or pass the draft upon which the conviction rests. Nor did she cash any of the other drafts. That was done by Merle Cook. Even Sandra Heldt so testified. The court instructed the jury:

"* * * You are now instructed that there are two essential elements of said crime under the law, namely, (1) that the defendant must know that the instrument or writing in question was forged, and (2) that the defendant must utter, dispose of, or put off as true the instrument or writing in question with intent to defraud. Therefore, you are instructed that you cannot convict defendant Currie of Forgery in the Second Degree, as charged in the information, unless you find (1) that she knew that the instrument or writing referred to in the information as a certain false and forged instrument in writing commonly called a draft was forged, and (2) that with intent to defraud she uttered, disposed of, and put off as true the said instrument. * * *

"Both of the elements that I have referred to must be established by the evidence beyond a reasonable doubt. If both of said elements

are not established by the evidence beyond a reasonable doubt, you must return a verdict of not guilty. I charge you that the first element of the crime of which the defendant is charged in the information is conceded by the defendant.

"* * * I charge you that the sole issue for you to determine is whether the second element has been established by the evidence beyond a reasonable doubt. Therefore, the question before you is: Did defendant Currie utter, dispose of, or put off as true the instrument or writing which was received in evidence as State's Exhibit A?"

Taking the above instruction literally would require a dismissal because there is no evidence that defendant ever actually uttered or disposed of the draft upon which the conviction rests. But the court then went on to say:

"The words 'utter', 'dispose of', and 'put off as true' have the same meaning. * * * there is no dispute that Merle Cook uttered, disposed of, and put off as true State's Exhibit A with intent to defraud by cashing it at the Music Bar. In order to connect the defendant, you must find that the defendant was an accomplice of Merle Cook and Sandra Joanne Heldt in the act of cashing State's Exhibit A with the intent to defraud.

"An accomplice is an associate or cooperator in the commission of acts constituting a crime. It appears from the evidence that Sandra Joanne Heldt was an accomplice and that she furnished the two books of forms with the intent that they be cashed."

The court then instructed the jury as to the definition of a principal under § 610.12, which reads:

"Every person concerned in the commission of a crime, whether he directly commits the act constituting the offense, or aids and abets in its commission and whether present or absent, and every person who directly or indirectly counsels, encourages, hires, commands, induces, or otherwise procures another to commit a crime, is a principal, and shall be indicted and punished as such."

Finally, the court instructed the jury as to the necessity for corroboration of an accomplice, quoting § 634.04, and informed the jury

that if defendant withdrew she could not be deemed to be an accomplice in the cashing of the draft involved.

Defendant became a principal under § 610.12[9] when she originally participated in the scheme of cashing these drafts by filling in the blank forms. It was not necessary that she actually cash the drafts to remain a principal.[10] If, for instance, when the state rested its case, the testimony of Sandra Heldt had been corroborated, either by a handwriting expert or otherwise, showing that the blank forms had been filled in by defendant for the purpose of cashing them, it would have been sufficient to warrant a finding of guilt, whether she or her confederates actually cashed them. The question then arises—the state's having established a prima facie case—on whom does the burden rest of proving a withdrawal so as to exonerate the defendant from criminal responsibility? In Federal conspiracy cases it has been held that once a defendant has been shown to have been a confederate in a conspiracy the burden of satisfying the jury that he has withdrawn before the consummation of the criminal act rests on the defendant.[11]

If we are to apply the same rule to this case, how far must the defendant go and by what degree of proof must he sustain this burden? We think the rule ought to be that, once the state has established a prima facie case, the burden rests on the defendant of going forward with the evidence of withdrawal to a point where it can be said a reasonable doubt exists and that, having reached that point, the burden rests on the state of proving beyond a reasonable doubt that the defendant remained as a participant in the consummation of the crime.

Much the same is true of the defense of alibi. Under our decisions, the defendant need not prove an alibi beyond a reasonable doubt.[12] In other words, the burden rests on the state of proving the essential

---

[9]For its counterpart in the Criminal Code of 1963, see § 609.05.

[10]See, State v. Guy, 259 Minn. 67, 105 N. W. (2d) 892.

[11]See, for instance, United States v. Cohen (2 Cir.) 145 F. (2d) 82, 90; Strauss v. United States (5 Cir.) 311 F. (2d) 926, 931.

[12]State v. Stiel, 157 Minn. 461, 196 N. W. 940; State v. Klashtorni, 177 Minn. 363, 225 N. W. 278.

elements of the crime, including the presence of the defendant at the place where it was committed, in spite of a claim of alibi.

The general rule is stated in 1 Wharton, Criminal Evidence (12 ed.) § 14, p. 41, as follows:

"Although it is frequently stated in the class of case under consideration that the burden of proof as to the particular issue is upon the defendant, it must be remembered that it is in fact the burden of going forward with the evidence. In all criminal prosecutions, without regard to the nature of the defense which the defendant may raise, the burden of proof remains at all times upon the prosecution to establish the guilt of the defendant beyond a reasonable doubt. If the defendant raises a sufficient doubt as to any material element, and the prosecution is then unable to overcome this evidence, the prosecution has failed to carry its burden of proof of the defendant's guilt beyond a reasonable doubt and the defendant must be acquitted."[13]

In State v. Stallman, 78 R. I. 90, 93, 79 A. (2d) 611, 612, the court said:

"* * * While a defendant never has the burden of proving his innocence, and on the whole case the state always has the burden of establishing his guilt beyond a reasonable doubt, nevertheless after the state has made out a prima facie case the burden of adducing evidence to support an affirmative defense devolves upon him. Especially is this true when as a justification or excuse a defendant is relying on a fact the subject matter whereof lies peculiarly within his knowledge and relates to him personally."

The difficulty in this case arises from the fact that it is conceded that defendant was originally a participant in the scheme to utter these drafts and actually took part in preparing them for issuance, but it is also conceded that she took no part in the actual passing of the drafts.

■ The question next arises: Must the testimony of an accomplice be corroborated on the phase of the case involving a withdrawal? We

---

[13]See, Chaffee & Co. v. United States, 85 U. S. (18 Wall.) 516, 21 L. ed. 908; James v. State, 167 Ala. 14, 52 So. 840; State v. Bailey, 79 Conn. 589, 65 A. 951; People v. Tubbs, 147 Mich. 1, 110 N. W. 132.

think that indirectly it must, for the reason that the ultimate burden of proving that defendant was a principal involves proof not only that she was originally an accomplice in the scheme or plan to defraud but that she remained such until the crime was consummated. If by her evidence she establishes a reasonable doubt that she continued to be a participant in the crime, the burden rests on the state to prove that her claims are unfounded. To do so, the testimony of an accomplice will not suffice.

We would be compelled to hold that on the record the evidence does not sustain the conviction were it not that the state and defendant stipulated at the close of the trial that the only issue in the case was whether defendant withdrew before the commission of the crime and that the state may have been induced thereby to refrain from introducing corroborating evidence (which counsel for the state claimed it had on oral argument). In view of that situation, however, we have concluded to grant a new trial rather than to discharge defendant.

Reversed and new trial granted.