STATE v. ERVIN E. MARTIN.

197 N. W. 2d 219.

April 21, 1972—No. 42934.

*C. Paul Jones,* State Public Defender, and *Ronald L. Haskvitz,* Assistant State Public Defender, for appellant.

*Warren Spannaus,* Attorney General, *George M. Scott,* County Attorney, and *Henry W. McCarr, Jr.,* and *David G. Roston,* Assistant County Attorneys, for respondent.

Heard before Murphy, Peterson, Kelly, and Mason, JJ.

MURPHY, JUSTICE.

Appeal from a judgment of conviction on an indictment charging defendant with murder in the first degree. Minn. St. 609.185 (1). It is contended that defendant's marital privilege was violated by the testimony of his alleged wife; that he was denied

due process of law and a fair trial by the introduction into evidence of a prior criminal record; and that the evidence was not sufficient to establish guilt beyond a reasonable doubt. Lesser claims of error include admission of hearsay evidence, errors in the court's instructions, and failure of the state to turn over evidence to the defense prior to trial.

The prosecution grew out of the following facts. On November 22, 1968, Harold Jordan, a citizen of South Dakota, came to Minneapolis to see his 24-year-old daughter, Nancy Meyer, who was employed as a waitress. The following day he called her apartment but got no answer. He then called her place of employment and found that she had not reported to work for several days. He went to her apartment, and no one responded to his knocks. He secured a passkey from the landlord, and, on entering, found the dead body of his daughter upon the bed, with a pillow over her head, tucked in on one side. She was attired in a short nightgown. He also found her open purse empty and her wallet missing.

The investigation by the policemen who were called yielded no evidence of a forced entry or of any drugs or empty prescription bottles. It was revealed at the trial, however, that the deputy county medical examiner (who did not testify at the trial) did find some empty drug bottles in the apartment. The police also found three pages of handwritten material, which were described as having been written by a depressed or despondent person. An autopsy was performed on the body by Dr. William R. Anderson, a pathologist at Hennepin County General Hospital, and revealed that the girl had been 20 weeks pregnant and that there was a large accumulation of fluid within her lungs, a pulmonary edema. No needle marks were found. There was no evidence of trauma, such as bruises. The chief pathologist, Dr. John I. Coe, made a preliminary indication of the cause of death as "probable drug reaction, type undetermined." However, the tests run by toxicologist Edward O. Locke revealed that the decedent's body contained no alcohol, no codeine, no barbiturates, and no aspirin.

Dr. Coe's report indicated the presence of an unknown drug, but attempts to verify that finding prior to trial proved futile. Locke testified that all his tests for the presence of drugs in the body were "completely negative." Locke's findings were corroborated by studies conducted by another toxicologist, Lowell C. VanBerkom, on samples of the dried froth taken from the decedent's nose and mouth. He found no evidence of the presence of any "hard drugs" or aspirin.

As a result of the autopsy and toxicological findings, neither Dr. Anderson nor Dr. Coe was able to form an opinion as to the cause of death. Dr. Coe testified at trial that his preliminary guess as to drug reaction was speculative and not "based on reasonable medical certainty." Dr. Anderson testified that the accumulation of fluid could have contributed to death, and both he and Dr. Coe stated that death by suffocation would be consistent with the findings. Dr. Anderson observed that the findings were also consistent with death by suicide or natural causes. The death certificate states that the cause of death was "probable drug ingestion, type not determined."

After some preliminary work by the police department, the investigation was closed when Dr. Coe's report was received but was reopened sometime in the early part of 1970. The investigation revealed that the decedent had picked up two paychecks at her place of employment shortly before her death. It appears that the first contacts made in the investigation were with Mr. and Mrs. Donald Drake and with a private agency which the decedent had allegedly contacted to assist in locating the father of the child she was soon to bear. As a result of the investigation, five witnesses were found who testified at trial that defendant, Ervin E. Martin, had admitted killing the decedent. Donald Drake, a friend of defendant, admitted that he, defendant, and one Larry Mihlbauer were "pulling some small robberies around Minneapolis" at the time when defendant and decedent were living together in the Drake apartment in 1968. The decedent knew of these robberies. Shortly before her death, defendant

expressed concern that "Nancy Meyer had threatened to go to the police with information about the robberies we had pulled." He told the Drakes "that he was going to kill her anyway, so he might as well wait until she got her paycheck and it wouldn't be for nothing." Mrs. Drake testified that sometime in October 1968, defendant told the Drakes and Mr. and Mrs. Mihlbauer that "he was going to have to kill Nancy. And [Mr. Drake] was kidding around, and he said, 'If you are going to kill someone, why don't you just shoot them and get it over with?' And Marty [defendant] said at the time, no, he had a better way, and a bullet is too messy and too easy to trace. And if he was going to kill them he would strangle them and—or suffocate them. And he was playing with a pillow on the couch at that time."

At about 8 o'clock on the evening of November 20, 1968, defendant asked Drake to drive him to Nancy's apartment, where he was going to have another talk with her. At that time he expressed concern that Nancy had threatened to go to the police. He also stated that he was considering robbing the grocery store which was located in the building after he had visited Nancy. Drake returned about 30 to 45 minutes after he had dropped defendant off at the apartment and picked him up. In the car, defendant displayed Nancy's billfold and checks. Drake related their conversation in the automobile en route from Nancy's apartment to defendant's home. He testified:

"Well, prior to him going in there we had discussed robbing the store that was in the building. He told me he was going to go up and have a talk with Nancy. And on the way out he was going to try to rob the store in that same building. So I came back to pick him up, and he came and got in the car. And I asked him, 'Did you rob the store?' He said, 'No, I didn't get it. I killed Nancy.' I said, 'Hah, come on, you are kidding me.' And he says, 'No, I killed her.' And then he showed me the checks and the sack with the beer cans in it."

When they arrived at defendant's home, defendant's alleged wife, Jean Marie Bloom, and Mrs. Drake were present. Defend-

ant told Jean that "Nancy Meyer is dead." He admitted killing her "[b]ecause she was going to go to the police and tell the police of some—of some things that have happened that would put me back in prison." Defendant told Jean he had suffocated the decedent. He also admitted to Mrs. Drake that "I killed her. I suffocated her with a pillow." On the next day, November 21, 1968, defendant gave Mrs. Drake more details of the murder:

"A. He said that when he killed her she was wearing her red negligee, and one arm was clutching at a sheet and the other one was clutching at the head of the bed or at the pillow.

"Q. Did he say anything else at that time?

"A. He said that when he was cleaning up he was wiping his fingerprints and that from the apartment, her eyes were open. And he had the feeling that she was looking at him or something. And he put—he said he left the pillow over her head or put another pillow over her head."

About 2 weeks later, Larry Mihlbauer and his wife, Joann, had dinner at defendant's apartment. At that time, he admitted killing Nancy. He further stated that it bothered him a little bit, but "I just put it out of my mind. * * * I don't have no conscience about it." Joann Mihlbauer recalled that defendant was bothered only by Nancy's last words, which were "I love you." She gave the following account of a conversation between her and defendant in January 1970:

"Q. And would you relate to the Court and jury what conversation took place at that time.

"A. He said that to prove to me how cold-blooded he could be, he said he took Nancy to bed and then killed her, and afterwards he wiped off his fingerprints."

Defendant's counsel attacked the testimony of Larry Mihlbauer by eliciting from him the fact that he had participated with defendant in several robberies and was promised complete immunity by the prosecution in exchange for his testimony against defendant. Typical of his examination is the following:

"Q. Well, have you ever been engaged in any kind of occupation together, work?

"A. The three of us working together, no. But I know what you are driving at, and so ask me straight out and I'll answer it.

"Q. All right. I'll ask you, sir, have you ever worked together with Mr. Drake and Mr. Martin?

"A. No, not working.

\* \* \* \* \*

"Q. So you were involved in robberies prior to Nancy Meyer's death?

"A. Yes."

On the night of Nancy's death, Jean Marie Bloom, at the urging of defendant and Drake, endorsed Nancy's name on the two payroll checks and cashed them at a Minneapolis bar.

On January 12, 1970, the investigators interviewed Martin in the Hennepin County workhouse. After waiving his constitutional right to remain silent, he told them that he had married one Elaine Peterson in Nebraska and that they had since separated. He said he had returned to Nebraska to discover that she was pregnant and remarried. He came back to Minneapolis, and "knowing that neither had had a legal divorce, he married Jean Marie [Bloom] Martin." Detective Russell Krueger testified:

"We again talked to him on the 12th in the Hennepin County Jail. I tried to get his marital status straight. He had so many wives we couldn't figure out which was which. He said that he failed to divorce the last one and married Jean Martin knowing that he was still married to the last girl. But he went down to Nebraska and found out that she had remarried and was pregnant, so he didn't even bother getting a divorce. He married Jean Martin and then had a child with Jean."

Defendant gave Detective Robert O'Rourke the following account of his actions on the night of Nancy's death:

"He said that he gained admittance and after some conversation that he made love to Nancy Meyer. And at that time he said

that he advised her that a group—motorcycle group called the Outlaws had let a contract on her.

\* \* \* \* \*

"\* \* \* He said that she then gave him the two checks.

"I asked him at this point why she didn't sign them if she gave them to him. He did not respond. He just hung his head and did not answer me. I pursued the question, and he just declined to answer.

"I then asked him if he, after leaving the apartment, if he advised Donald Drake that he had killed Nancy. He first denied it. And then later admitted that he had told Donald Drake that he had suffocated her with a pillow.

"He said that they returned—he says—or he insisted at the time he left the apartment Nancy Meyer was alive and breathing. He used the words, 'alive and breathing.'

"He then stated that he and Drake went back to his apartment, and that Jean Martin signed the checks, and the three of them, Martin, his wife, and Donald Drake went to Danny's Bar where Jean Martin went in and cashed the checks.

"He admitted that he had told Jean Martin, his wife, and a Joann Choma, and Larry Mihlbauer, and a Donald Drake, that he had killed Nancy Meyer. But he said that he hadn't really done so.

"Q. Now, did he indicate to you that Mr. Drake was ever in the Nancy Meyer apartment on the evening she died?

"A. He denied that Drake had been in the apartment."

1. Defendant first contends that his marital privilege was violated when the court permitted over objection the testimony of Jean Marie Bloom. As has already been indicated, her testimony related to the conduct of defendant in delivering to her the checks he had taken from the decedent; how she had cashed the checks at his direction and request; and his admissions about how he had obtained the checks and that he had suffocated decedent with a pillow. If, in fact, Jean Marie Bloom was the wife of defendant, the objection should have been sustained. Minn.

St. 595.02(1) provides that a wife cannot be examined for or against her husband, without his consent, as to any communication made by one to the other during marriage. Of equal importance to the issue is § 517.03, which provides: "No marriage shall be contracted while either of the parties has a husband or wife living * * *." [1] Preliminary to Jean Bloom's testimony, a hearing was held out of the presence of the jury to consider the question of marital privilege. Defendant apparently produced a copy of a marriage certificate purporting to evidence his marriage to Jean Bloom. The state attempted to show that the marriage certificate was invalid and therefore not an impediment to her testimony by offering (1) a Nebraska marriage certificate, duly certified, between defendant and Elaine Peterson, and (2) her affidavit that the marriage had not been dissolved by divorce. Defendant's counsel contended that the Minnesota certificate sufficiently evidenced a marriage to invoke the statutory privilege and that the affidavit of Elaine Peterson was hearsay and could not be considered by the court in passing upon the admissibility of Jean Bloom's testimony. The trial court was of the

---

[1] See, also, Minn. St. 602.02, which provides: "When the fact of marriage is required or offered to be proved before any court, evidence of the admission of such fact by the party against whom the proceeding is instituted, or of general repute, or of cohabitation as married persons, or any other circumstantial or presumptive evidence from which the fact may be inferred, shall be competent."

Minn. St. 517.01 provides: "Marriage, so far as its validity in law is concerned, is a civil contract, to which the consent of the parties, capable in law of contracting, is essential. Lawful marriage hereafter may be contracted only when a license has been obtained therefor as provided by law and when such marriage is contracted in the presence of two witnesses and solemnized by one authorized, or whom the parties in good faith believe to be authorized, so to do. Marriages subsequent to April 26, 1941, not so contracted shall be null and void."

Minn. St. 600.20 provides: "The original certificate and record of marriage, made by the person solemnizing such marriage as prescribed by law, and the record thereof or a duly certified copy of such record, shall be prima facie evidence of such marriage."

view that the burden rested upon the claimant of the privilege to establish facts necessary to invoke it. State v. Staat, 291 Minn. 394, 192 N. W. 2d 192 (1971). When no effort was made by defendant to testify or to make any showing contrary to the state's contentions with reference to his marital status, the trial court determined that, under the circumstances, defendant was not entitled to the privilege. In connection with this point, it should be noted that defendant had admitted to Detectives O'Rourke and Krueger that he had committed bigamy. Krueger testified that defendant had said to him: "He had so many wives we couldn't figure out which was which. He said that he failed to divorce the last one and married Jean Martin knowing that he was still married to the last girl."

The action of the trial court in considering the affidavit of Elaine Peterson is approved in Howard v. Sigler, 454 F. 2d 115, 118 (8 Cir. 1972), in which the court said:

"* * * While there may be times when the interests of justice require that witnesses be produced in person to present evidence on the question of admissibility, we do not think that the Confrontation Clause requires that they be produced in every case; some discretion should be left to the trial judge to determine whether production of the witness is actually necessary in view of the other facts presented on the question of admissibility."

The court then pointed out that in commenting on Rule 104(a) of the new Proposed Rules of Evidence for the United States Courts and Magistrates (March 1971 Draft) the Advisory Committee's Note quoted McCormick, Evidence, § 53, p. 123, note 8, as follows:

"Should the exclusionary law of evidence, 'the child of the jury system' in Thayer's phrase, be applied to this hearing before the judge? Sound sense backs the view that it should not, and that the judge should be empowered to hear any relevant evidence, such as affidavits or other reliable hearsay."

The court also observed that numerous decisions made under the Federal Rules of Civil Procedure are determined on the basis of affidavits.

In reviewing this claim of error, we are of the view that, under the circumstances, the trial court properly exercised its discretion in denying the privilege. While the showing that Elaine Peterson was not available to testify, which might have given greater support to the use of her affidavit, was not as strong as it might have been, we think it was nevertheless sufficient under the entire evidence. Defendant had admitted that he knew he was not divorced from Elaine Peterson. In the face of the evidence of his marriage to Elaine Peterson, as well as her affidavit that there had been no divorce, it would have been a simple matter for defendant to produce evidence to the contrary if such existed or to rebut the assertions by his own testimony at the special hearing in chambers.

2. It is next contended that defendant was denied due process of law and a fair trial because of the admission of evidence of prior crimes and a criminal record. This claim is supported by motions for mistrial. It is directed to the testimony of Jean Bloom, who said that defendant had told her that he killed Nancy Meyer "[b]ecause she was going to go to the police and tell * * * of some things that have happened that would put me back in prison." The objection is also directed to the testimony of Detectives O'Rourke and Krueger that defendant admitted he was a bigamist and that he had used marijuana; to the testimony of Donald Drake that when defendant went to Nancy Meyer's apartment on November 20, 1968, he had said he intended also to rob a store in the same building. It is also directed to Jean Bloom's testimony that defendant told her that he and Drake had been robbing places; to Larry Mihlbauer's statement that defendant was "supposed to be pulling robberies and things" and that he had been told this by Nancy Meyer; to Aileen Drake's testimony that she knew that her husband and defendant had committed two grocery store robberies or more; and to Drake's testi-

mony that he and defendant were "pulling some small robberies around Minneapolis."

It is well established that evidence that the accused has committed another crime unrelated and unconnected with the one for which he is on trial is inadmissible since it is not competent to prove one crime by proving another. State v. Wofford, 262 Minn. 112, 114 N. W. 2d 267 (1962); State v. Gress, 250 Minn. 337, 84 N. W. 2d 616 (1957). The general rule is expressed in State v. Sweeney, 180 Minn. 450, 455, 231 N. W. 225, 227 (1930), as follows:

"The general rule in a criminal case is that evidence which in any manner shows or tends to show that the accused has committed another crime independent of that for which he is on trial is inadmissible. The reason is obvious and the rule should be rigorously enforced. The rule, however, like most rules, has certain exceptions not to be stated categorically but among which evidence of other crimes is admissible to prove the accusation when it tends to establish (1) motive, (2) intent, (3) absence of mistake or accident, (4) the identity of the accused, (5) sex crimes, (6) a common scheme or plan embracing the commission of similar crimes so related to each other that proof of one or more of such tends to establish the accusation. Such is the common law."

The most recent statement on the subject is set forth in the Gress case (250 Minn. 346, 84 N. W. 2d 623):

"* * * It is clear from our decisions that facts must exist furnishing proof of a common scheme or plan before the evidence as to related offenses or crimes will be received. Such evidence is ordinarily of such prejudicial nature that in the absence of proof fairly establishing a common scheme, plan, or pattern, the evidence ought not to be admitted. See, State v. Haney, 219 Minn. 518, 18 N. W. (2d) 315; State v. DePauw, 246 Minn. 91, 74 N. W. (2d) 297."

See, also, State v. Spreigl, 272 Minn. 488, 139 N. W. 2d 167

(1965); State v. Huffstutler, 269 Minn. 153, 130 N. W. 2d 347 (1964); State v. Currie, 267 Minn. 294, 126 N. W. 2d 389 (1964).

We think the rule to be applied in this case is that, in a criminal prosecution, evidence that other criminal acts have been committed by the accused may be admissible to show his motive for the commission of the offense charged, notwithstanding such evidence proves or tends to prove an offense other than that charged. Where the motive for the crime charged is concealment of some other crime, either by destroying the evidence of such other crime or killing a witness who would testify thereto, the evidence of such motive is admissible, even though it tends to show the commission of an extraneous crime. 29 Am. Jur. 2d, Evidence, § 325. Here, the record is replete with evidence of the fact that decedent was aware of defendant's criminal activities; that she had threatened to report them; and that defendant, on more than one occasion, had expressed his intention to kill her so as to remove the possibility that she might report his crimes. Moreover, it appears from the record that it was part of defendant's trial strategy to develop this evidence, the purpose being to discredit the state's witnesses. This was particularly true of the examinations by the defense of Larry Mihlbauer and Donald Drake.

Nor are we satisfied that there was prejudicial error by the failure of the state to provide the defense with a so-called Spreigl notice. This requirement originated with State v. Spreigl, *supra,* where we held in a prosecution for taking indecent liberties with a stepchild, where opportunity for collusion was great, that failure of the state to give notice of its intention to introduce evidence that defendant had previously committed similar acts with the victim and with other children required a new trial. We observed in State v. Boyce, 284 Minn. 242, 170 N. W. 2d 104 (1969), that the Spreigl decision was not intended to apply with respect to evidence offered in a homicide prosecution bearing directly upon the history of the relationship existing between one accused of murder and the victim. Here, there was no evidence by

which it was attempted to establish that defendant had in fact committed other crimes. The evidence relating to other crimes of defendant was necessarily, but incidentally, a part of the substantive proof of the offense since defendant's fear that decedent would disclose such crimes to the police was his expressed reason for the murder.

Defendant's objection to the testimony bearing upon the offense of bigamy may be disposed of by noting that he made no timely objection to this testimony.

Nor can we agree with defendant that the trial court erred in refusing to instruct the jury that the death certificate was prima facie evidence as to the manner in which death was brought about. Minn. St. 144.167 does say that a timely filed death certificate "shall be prima facie evidence of the facts therein stated." We have held that the statutory rule does not apply to statements pertaining to the manner in which the death was brought about. We held in Engel v. Starry, 268 Minn. 252, 259, 128 N. W. 2d 874, 878 (1964):

"Such certificate is admissible as prima facie evidence of the facts showing the immediate cause of death, but the manner in which the cause of death is brought about, that is, by accident, suicide, or homicide, is not admissible for the reason that they constitute conclusions, not facts."

See, also, Backstrom v. New York Life Ins. Co. 183 Minn. 384, 236 N. W. 708 (1931); State v. DeZeler, 230 Minn. 39, 41 N. W. 2d 313 (1950). Moreover, prima facie evidence is not conclusive, State, by Clark, v. Wolkoff, 250 Minn. 504, 85 N. W. 2d 401 (1957), and where there is contrary evidence, the issue is for the trier of fact.

3. At the Rasmussen hearing preliminary to trial, defense counsel made a demand that the prosecution conduct a "searching inquiry" to determine "whether or not there is in existence any information of whatever kind, physical, written or oral, that is favorable to the defendant." It is our view that defendant's

contention that the state failed to turn over favorable evidence pursuant to this request is without merit. The request was of the "dragnet" variety referred to in Brady v. Maryland, 373 U. S. 83, 83 S. Ct. 1194, 10 L. ed. 2d 215 (1963). In the more recent case of United States v. Moore, 439 F. 2d 1107, 1108 (6 Cir. 1971), the court said:

"* * * To grant such a motion would place an almost impossible burden on the Government. The motion is not even limited to evidence in the possession of the Government. The Government would have to determine before trial whether the evidence is favorable as well as relevant. If this pretrial practice were adopted, there would be little left of our adversary system. It must be remembered that in criminal cases the defendant is not required to disclose anything."

In State v. Mastrian, 285 Minn. 51, 171 N. W. 2d 695 (1969), certiorari denied, 397 U. S. 1049, 90 S. Ct. 1381, 25 L. ed. 2d 662 (1970), the defendant made a pretrial motion for an order directing the state to produce for inspection by defendant all statements of witnesses, material used to refresh witnesses' recollection, the notes, memoranda, and reports of investigating officers, all tangible evidence seized or prepared for trial, and other information and material involving the crime which the state had in its possession. This motion was denied. The court stated (285 Minn. 63, 171 N. W. 2d 703):

"It has long been our rule that a criminal defendant cannot compel the state to permit him to examine the evidence against him prior to trial. State ex rel. Robertson v. Steele, 117 Minn. 384, 135 N. W. 1128.

"It is true that in a growing number of jurisdictions there has been movement toward open, free, and total pretrial discovery in criminal cases similar to that provided for in civil cases by the Rules of Civil Procedure. To adopt unqualified discovery, as urged by defendant, and to base a reversal thereon would be unjustified. Such a substantial change in our long-established

procedures should, we believe, be accomplished only by statute or by rules of court after a long and detailed consideration of the many policy considerations involved. See, generally, Louisell, *Criminal Discovery: Dilemma Real or Apparent?*, 49 Calif. L. Rev. 56."

In the case at hand, there was no fraud perpetrated on the court or jury. Mrs. Drake's letter (asking for immunity for her husband in return for testimony at trial) was turned over to defense counsel, who used it to cross-examine her. The jury was fully apprised of the contents of the letter. Similarly, the toxicologists' reports were handed over to defense counsel during cross-examination of the witnesses. Counsel used these reports in his cross-examination. Again, evidence favorable to defendant was not suppressed by the prosecutor and no fraud was perpetrated on the trier of fact. Moreover, the toxicologists' reports, indicating no drugs present in the samples from Nancy's body, can hardly be deemed "favorable" to defendant.

Dr. Crosson's report, indicating the possibility of drugs present in Nancy's body and the presence of empty bottles allegedly found in Nancy's apartment, also was in the hands of defense counsel during the trial. Again, counsel used this report to cross-examine one of the doctors who testified:

"Q. (Mr. Kennedy) Dr. Crosson's report, he indicated that he found some empty drug bottles.

"A. Yes, he did.

"Q. In Nancy Meyer's apartment.

"A. Yes."

We conclude that there was no prosecutorial suppression of any evidence favorable to defendant.

It is apparent from what has already been stated that the evidence was sufficient to support the verdict. The medical testimony was consistent with death by suffocation; defendant admitted his guilt to at least five people; he undeniably had possession of the victim's wallet and paychecks immediately after the

crime; and the evidence establishes that he was motivated by fear that the victim would expose his criminal activities. The record indicates that he had a fair trial and that he had the benefit of an energetic defense by two able and conscientious lawyers.

The other points raised by defendant are without sufficient substance to require discussion.

Affirmed.