STATE of Minnesota, Respondent,

v.

John Kevin David SCRUGGS, Appellant.

No. C4–87–719.

Supreme Court of Minnesota.

March 25, 1988.

708

William E. McGee, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas L. Johnson, Hennepin Co. Atty., Minneapolis, for respondent.

POPOVICH, Justice.

Appellant John Scruggs was convicted of murder in the first degree in connection with the shooting death of Christine Kreitz, following a jury trial in Hennepin County District Court, and was sentenced to life imprisonment. On appeal, appellant alleges (1) there is insufficient evidence to sustain the conviction; (2) the plea agreements entered into between the state and the state's chief witnesses violated appellant's right to a fair trial and due process of law by encouraging false testimony; (3) the trial court erred in failing to hold a *Spreigl* hearing with regard to evidence of appellant's involvement in a gun store burglary; (4) the prosecutor's comments during his closing argument were misconduct requiring a new trial; and (5) the admissible evidence before the grand jury was insufficient to support the indictment. We affirm.

I.

The body of 16–year–old Christine Kreitz was found in Martin Luther King Park in Minneapolis at 7:00 a.m. on October 13, 1985. An autopsy revealed that Kreitz died from two gunshot wounds to the head. Although Kreitz' pants were pulled down to her knees and her underwear had been torn off, the autopsy revealed no evidence of sexual assault.

Prior to her death, Kreitz was associated with a youth gang named The Black Gangster Disciple Nation (the "Disciples"). Several gang members testified appellant (a.k.a. "Sheik") was the leader of both the St. Paul and Minneapolis factions of the Disciples in September, 1985. The gang

held regular meetings, some of which were held at appellant's home.

The Disciples had a "code of silence" which prohibited gang members from talking to outsiders about gang activities. For a violation of the code of silence a gang member could be beaten. The penalty for providing information to the police was to be killed by being shot twice in the head.

On September 21, 1985, a Disciples meeting was held at the home of gang-member Mary Braxton. During the meeting appellant led a discussion planning a burglary of the Minneapolis Outlet Gun Exchange. Although appellant denied being present while the burglary was planned or carried out, several other witnesses described the burglary as follows: Appellant sent gang-members Grailon Williams and Orpheus Hicks to steal a van. A group of Disciples then went in the van to the gun store. The burglary attempt was aborted, however, due to "too much traffic" and the gang members returned to Braxton's house. Later, several gang members, including appellant and Christine Kreitz, returned to the gun store. Appellant wore a leather jacket when he left Braxton's house. Appellant and Kreitz waited across the street from the gun store while several gang members broke the front windows and grabbed handguns. Appellant then ran in and stole more guns.

The police arrived and arrested Kreitz and unsuccessfully chased a suspect matching appellant's description, who was wearing a dark-colored waist length jacket. Shortly thereafter, the police found six handguns lying nearby and a dark-colored leather jacket, which was dry despite the rainy weather conditions. When appellant arrived back at Braxton's he was no longer wearing the leather jacket. He told members of the Disciples he had stolen some handguns and thrown them behind a bank before evading the police. Appellant stated Christine Kreitz had been caught and might be "snitching" to the police. Appellant distributed the stolen handguns among the Disciples.

On October 1, 1985, gang-member Patrick Owens was arrested while in posses-sion of one of the guns stolen from the gun store. Owens gave the police information implicating appellant in the gun store burglary. On October 7, 1985, police executed a search warrant at appellant's home, but no guns were found. The police informed defendant he and the Disciples were suspects in the burglary.

In late September, 1985, appellant was introduced to Kwame McDonald and Robert Hickman. Both McDonald and Hickman were involved in community organizations helping youth. The two men, concerned about gangs and teenage prostitution problems, became acquainted with appellant because they were informed appellant had contacts with gangs. Appellant met with McDonald and Hickman a number of times and both men felt appellant was successful in helping reduce teenage prostitution in St. Paul. Hickman testified no money was ever promised to appellant, but appellant was given a copy of a grant proposal for $58,580 to be used to create jobs for youth. Appellant told the Disciples the money would be used to get them jobs. Disciples member Sandra White testified appellant told her the money would be used to buy a club to be called "Le Sheik's Bar."

At approximately 4:00 p.m. on October 12, 1985, a meeting was held at the Inner City Youth League in St. Paul. Present were appellant, Disciples Sandra White and David Carson, Hickman, McDonald, and St. Paul Mayor George Latimer. The purpose was to enlist Mayor Latimer's support in raising funds for the grant proposal. Mayor Latimer was under the impression appellant was a former gang leader. He stated he favored creating job opportunities to get youth off the streets, but any illegal gang activity would be prosecuted to the full extent of the law. After the meeting, appellant made a video for the Inner City Youth League. Hickman gave appellant a ride home at approximately 7:30 p.m.

The same evening, the Disciples gathered at Mary Braxton's house. Christine Kreitz arrived at 6:00 or 6:30 p.m.. When Kreitz arrived, two of Braxton's children, a friend named Christine Canada, and two small children for whom Braxton was babysitting

were present. Kreitz had a headache and Braxton gave her a prescription desipramine tablet—a medication used to combat depression. Other Disciples and friends, including Donald Hunter and Marion Gilchrest, came to Braxton's on their way to a nearby party.

Appellant called and spoke to Braxton and Hunter. Appellant told Hunter there were two "snitches" in the organization and something had to be done. When Hunter inquired further, appellant said, "[I]t's already under control." Appellant later arrived at Braxton's home.

Sandra White testified appellant called her home and spoke to Grailon Williams. Appellant stated Williams and White should go to Braxton's. Williams told White to bring a "missile" (i.e., a gun). White took her .22 caliber revolver, and she and Williams took the bus to Braxton's.

White testified they arrived at Braxton's at approximately 1:30 a.m. She testified further that while Kreitz was sleeping in a chair, appellant, Braxton, Williams and White went into the bathroom together. Appellant asked White if she had brought the gun and she replied that she had. The four then went to another room, and appellant stated, "This got to be tooken care of tonight," and, "She may not come around here no more. I think she knows what's going on, but she's not for sure." Appellant told the others they should walk Kreitz home, find a secluded area and shoot her twice in the head while making the murder "look like a rape."

Kreitz, appellant, Williams, Braxton, White and Christine Canada stayed behind while other gang members left Braxton's to go to a nearby houseparty. Appellant told Kreitz she could not go to the party. She said she wanted to go home. Braxton and White both testified appellant told Williams, White and Braxton to walk with her. While walking, Williams had White give him the gun. As they approached the enclosed tennis courts at Martin Luther King Park, Braxton stated they were going to "smoke some weed." As Braxton and White rolled a marijuana cigarette, they heard a gunshot. White turned and saw Kreitz fall to the ground. Williams then shot Kreitz a second time as he stood over her.

Williams, White and Braxton ran back to Braxton's house. Braxton testified appellant asked if the "mission was accomplished" and they replied yes. Appellant told Braxton, "That's what snitches get." Appellant asked Williams for the gun, examined it, and told Williams to bury it.

Appellant, Braxton, White, Williams and Christine Canada then left Braxton's to join the other Disciples at the party. On the way they saw the others returning, so they returned to Braxton's. The Disciples returned to Braxton's and began discussing events that occurred at the party. Appellant called White, Braxton and Williams into the bathroom and told them to go back to the park and "make it look like a rape." The three went to the park, turned Kreitz' body over and removed or tore portions of her clothing. They then returned to Braxton's.

Disciple Marion Gilchrest was at Braxton's house when the three returned. He saw Williams, White and Braxton go behind the house and asked appellant what they were doing. Appellant answered they were "going to do a mission" for him behind the house. Later, Williams went behind the house and retrieved the murder weapon. Gang-member Orlando Richardson saw Williams behind the house. Appellant told Richardson Williams was "just taking care of some business for me." Donald Hunter saw Williams carry a shovel from the side of the house and heard appellant ask Williams, "Did you take care of the little business?"

After Williams returned to the front of the house, appellant told Braxton to get a paper bag. Williams later told White the gun was in the bag. Appellant asked Richardson to give Williams and White a ride back to St. Paul. Richardson did so, and Williams took the bag containing the gun with him. While crossing the Lake Street Bridge, Williams threw the bag out the window and it fell on the bridge itself. Williams told Richardson his hat had flown out the window. Richardson turned the

car around and Williams got out and threw the bag into the river. They then continued on to St. Paul.

The next day, the Disciples heard about Kreitz' death and met at Braxton's house. White testified appellant called White, Braxton and Williams into a separate room and told them to "just play like nothing happened." On the day of Kreitz' funeral, Braxton called a local television station and arranged a television interview. In the interview, she denied the Disciples were involved with the murder. Braxton testified appellant told her to do the interview to throw suspicion off the Disciples.

On November 6, 1985, the police arrested Sandra White for Kreitz' murder. White gave a statement to the police admitting involvement and that appellant ordered the murder. Mary Braxton was arrested the following day. She also gave a statement to the police, confessing to her involvement in the murder and implicating appellant.

In November, 1985, a grand jury returned an indictment against appellant, White, Braxton and Williams, charging them with murder in the first degree and conspiracy to commit murder in the first degree. In March, 1986, the prosecution and Sandra White reached a plea agreement. The agreement required White to plead guilty to the conspiracy charge and to cooperate with the prosecution by testifying truthfully at the trials of appellant and Williams. In exchange, the prosecution would dismiss the first degree murder charge and agree to a departure from the presumptive sentence for the conspiracy count. White would be given a probationary sentence and the state would relocate her and her children. Pursuant to this negotiation, she gave a lengthy statement to the prosecution on March 7, 1986, setting forth more details about the murder. Sentencing was delayed until after appellant's trial.

Mary Braxton and the prosecution reached a plea agreement in April, 1986. Braxton was allowed to plead guilty to the conspiracy charge and was required to cooperate with the prosecution by testifying truthfully at appellant's and Grailon Williams' trials. In exchange, the state would dismiss the first degree murder charge and agree to the imposition of the presumptive sentence of 67–73 months in prison. As part of this agreement, she gave a detailed statement about the murder. Her sentencing on the conspiracy conviction was delayed until after appellant's trial.

At trial, appellant denied being the leader of the Disciples and testified his involvement with the group was limited and was motivated by an interest in promoting the youth programs Robert Hickman and Kwame McDonald were involved with. Appellant denied planning or participating in the burglary of the Minneapolis Outlet Gun Exchange. He admitted being present at Braxton's on the night of the murder but denied any involvement. Appellant testified he did not see Grailon Williams that night. He admitted meeting privately with Braxton and White in the bathroom, but claimed it was for the purpose of reprimanding White for seeing other men while her boyfriend was in jail.

## II.

On appeal, appellant raises the following issues:

1. Whether there is sufficient evidence to sustain the conviction of murder in the first degree.

2. Whether the plea agreements entered into between the state and its chief witnesses violated appellant's right to a fair trial and due process of law by encouraging false testimony.

3. Whether the trial court erred in failing to hold a *Spreigl* hearing with regard to evidence of appellant's involvement in a gun store burglary.

4. Whether the prosecutor's comments during closing argument were misconduct requiring a new trial.

5. Whether the admissible evidence before the grand jury was sufficient to support the indictment.

## III.

1. Appellant contends the evidence was insufficient to sustain a conviction. In a criminal case, the court makes a painstaking review of the record to determine if the evidence was sufficient to permit the jury to reach the conclusion that it did. *State v. Ellingson,* 283 Minn. 208, 211, 167 N.W.2d 55, 57 (1969). This court will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that a defendant was proven guilty of the offense charged. *State v. McCullum,* 289 N.W.2d 89, 91 (Minn.1979). The court examines the evidence by viewing it in the light most favorable to the verdict, and will assume that the jury disbelieved any testimony in conflict with the result it reached. *State v. Oevering,* 268 N.W.2d 68, 71 (Minn.1978).

If believed, the testimony of Braxton and White was clearly sufficient to support the jury's verdict. Both women testified appellant ordered Kreitz' murder while meeting privately with Braxton, White and Williams at Braxton's home on the night of the killing. They testified they committed the murder, along with Williams, at appellant's direction. Both women also testified they later went back and removed clothing from Kreitz' body at appellant's direction to "make it look like a rape."

A conviction, however, cannot be had upon the testimony of an accomplice unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense. Minn.Stat. § 634.04 (1986). The corroboration requirement was explained by this court in *State v. Adams,* 295 N.W.2d 527, 533 (Minn. 1980), where we said:

Corroborating evidence must link or connect the defendant to the crime. It is not necessary that it establish a prima facie case of the defendant's guilt. *State v. Cooper,* 296 Minn. 48, 206 N.W.2d 356 (1973). It must point to the defendant's guilt in some substantial degree. The quantum of corroborative evidence needed necessarily depends on the circum-

stances of each case. *State v. Mathiasen,* 267 Minn. 393, 127 N.W.2d 534 (1964). Corroborating evidence may be circumstantial or direct. *State v. Stave,* 280 Minn. 269, 158 N.W.2d 848 (1968).

If the accused testified, the inadequacies and admissions in his testimony may be corroborative of the accomplice's testimony. Corroborating evidence may be secured from the defendant's association with those involved in the crime in such a way as to suggest joint participation, as well as from the defendant's opportunity and motive to commit the crime and his proximity to the place where the crime was committed. *State v. Mathiasen,* 267 Minn. 393, 127 N.W.2d 534 (1964). The defendant's entire conduct may be looked to for corroborating circumstances. If his connection to the crime may be fairly inferred from those circumstances, the corroboration is sufficient. *State v. Rasmussen,* 241 Minn. 310, 63 N.W.2d 1 (1954).

Corroboration of accomplice testimony is sufficient if it restores confidence in the accomplice's testimony, confirming its truth and pointing to the defendant's guilt in some substantial degree. *State v. Houle,* 257 N.W.2d 320, 324 (Minn.1977).

The state presented the testimony of three Disciples, Donald Hunter, Marion Gilchrest, and Orlando Richardson, to corroborate the testimony of Braxton and White. The witnesses provided the following testimony:

(1) Donald Hunter testified he spoke to appellant on the telephone on the evening of the killing. Appellant told Hunter there were two "snitches" and something would have to be done. When Hunter inquired further, appellant told him, "[I]t's already under control."

(2) Hunter testified that before leaving Braxton's for the party that evening, he saw appellant, Braxton, Williams and White come out of the bathroom. He testified appellant told the women he did not want them to go to the party because he had something for them to do. Several witnesses testified appellant told Kreitz she could not go to the party.

(3) Hunter and Marion Gilchrest testified appellant, Braxton, White, Williams and Kreitz stayed behind while the other Disciples left Braxton's to go to the party.

(4) Hunter and Gilchrest testified that after the Disciples returned to Braxton's from the party, appellant again called Braxton, White and Williams into the bathroom. Kreitz was no longer present.

(5) Later, after Williams, White and Braxton returned from allegedly removing and tearing clothes from Kreitz' body, Hunter saw them go behind Braxton's house. Hunter testified appellant said they were "just going to do a mission for him" behind the house.

(6) Hunter testified that during the time White claimed Williams was retrieving the murder weapon from the yard he saw Williams carrying a shovel and heard appellant ask Williams, "Did you take care of the little business?"

(7) Orlando Richardson testified that when he said he saw someone at the side of the house, appellant told him it was Williams, who was "taking care of some business" for him.

(8) Richardson testified that during a Disciples meeting at Braxton's the day after the killing, appellant called Braxton, White and Williams into a back room for a private meeting.

The circumstantial evidence supplied by the testimony of Hunter, Gilchrest, and Richardson is more than sufficient to corroborate the testimony of White and Braxton. The testimony of these witnesses places appellant in private meetings with White, Braxton and Williams before and after Kreitz left Braxton's. Particularly significant is the testimony of Hunter and Richardson that appellant stated Williams was on a "mission" for him while Williams was, according to White, retrieving the murder weapon from behind Braxton's house.

Admissions and inadequacies in appellant's testimony further corroborate White and Braxton's testimony. Appellant admitted being at Braxton's house on the night of the murder and meeting privately with Braxton and White before and after Kreitz left the house. In addition, the jury could reasonably disbelieve appellant's denial that he saw or spoke to Williams on the night of the killing in light of the testimony of several other witnesses that appellant and Williams were together that evening.

▪ We hold the evidence sufficient to support appellant's conviction of murder in the first degree.

2. Appellant contends the plea agreements entered into by three of the state's witnesses, Braxton, White and Patrick Owens, encouraged false testimony and therefore violated appellant's right to a fair trial and due process of law. Owens, who implicated appellant in the gun store burglary, entered into a plea agreement whereby three felony charges were dismissed in return for his truthful testimony. Braxton and White entered into plea agreements in which charges of murder in the first degree were dropped and they pled guilty to a charge of conspiracy to commit murder in the first degree while agreeing to testify truthfully in appellant's trial. Neither Braxton nor White was sentenced until after appellant's trial.

Appellant argues the plea agreements encouraged false testimony against him. In particular, appellant contends that White's testimony was tainted because her attorney, at the time of her plea agreement, informed her she must testify in conformity with her statements to police to be deemed testifying truthfully.

▪ We recently upheld the validity of Braxton and White's plea agreements in the face of similar arguments in *State v. Williams*, 418 N.W.2d 163 (Minn.1988). In holding the admission of Braxton and White's testimony constitutional in that case, we said, "It is neither unconstitutional nor improper to remind an accomplice of the terms of the agreement, or that reduced charges and a more lenient sentence depend upon the accomplice's willingness to fulfill his or her part of the bargain." *Id.* at 168. The rationale set forth in *Williams* applies with equal force to the plea agreements in this case. The jury was

made aware of the plea agreements through extensive cross-examination, and was free to assess the credibility of the witnesses in light of the agreements. We hold the testimony stemming from the plea agreements entered into by Braxton, White, and Owens did not violate appellant's right to a fair trial.

■ 3. Appellant contends the trial court erred in failing to hold a *Spreigl* hearing with regard to evidence of appellant's involvement in the burglary of the Minneapolis Outlet Gun Exchange. This court will not reverse a trial court's admission of evidence of other crimes or bad acts unless an abuse of discretion is clearly shown. *State v. Johnson,* 256 N.W.2d 280, 286 (Minn.1977).

■ In a criminal prosecution, evidence that other criminal acts have been committed by the accused may be admissible to show his motive for the offense charged, notwithstanding that such evidence proves or tends to prove an offense other than that charged. *State v. Martin,* 293 Minn. 116, 128, 197 N.W.2d 219, 226 (1972). Where the motive for the crime charged is concealment of some other crime, either by destroying the evidence of such other crime or killing a witness who would testify thereto, the evidence of such motive is admissible, even though it tends to show the commission of an extraneous crime. *Id.* 197 N.W.2d at 226–27. When offered to show the motive of the accused, evidence of prior crimes is not subject to the *Spreigl* notice requirements. *Martin,* 197 N.W.2d at 227; *State v. Black,* 291 N.W.2d 208, 215 (Minn.1980).

The evidence of the gun store burglary falls within the rule of *Martin* and *Black.* The state introduced evidence that appellant participated in a burglary in an effort to establish appellant's motive for the Kreitz murder; namely, preventing Kreitz from supplying information to the police about his involvement in the crime. Because evidence of the burglary was used to show motive, it does not fall within the *Spreigl* requirements. *Martin,* 197 N.W.2d at 227. The trial court did not abuse its discretion in denying appellant's

motion for a *Spreigl* hearing or by allowing the evidence of the burglary to be admitted.

4. Appellant next argues the prosecutor's comments during closing argument constitute misconduct requiring a new trial. During his closing argument, the prosecutor compared appellant to a character in a movie portrayed by the actor Karl Malden. In the movie, the Malden character was referred to as a "one-eyed jack." To illustrate his point, the prosecutor used an enlargement of a jack of spades playing card. He made one reference to the card as the jack of spades and thereafter only referred to the "one-eyed jack." Appellant contends the use of the card and the reference to the jack of spades was misconduct in that it was an appeal to racism and prejudice against the appellant, who is black.

Appellant also argues that the prosecutor committed misconduct near the end of his argument when he stated:

> A not guilty verdict in this case would say that John Scruggs wasn't involved in this killing. John Scruggs wasn't involved in any burglary. *Grailon Williams wasn't involved in any killing.* You have to ask yourselves who do you believe? Did seven people, those seven people, did they all lie; or did this man lie? I ask you to remember the one-eyed jack and suggest you've seen both sides.

(Emphasis added.)

Appellant argues the prosecutor's comment regarding Williams, the alleged triggerman whose trial had not yet begun, prejudiced the jury. Appellant contends the jury may have found appellant guilty for fear that a not-guilty verdict would serve to acquit Williams as well.

■ When a prosecutor's comments can be viewed as improper, and the conduct is unintentional, the test to be applied in determining whether the prosecutor overstepped the bounds of propriety to the extent requiring reversal is whether the statements likely played a substantial role in influencing the jury's decision. *State v. Race,* 383 N.W.2d 656, 664 (Minn.1986). The mere fact that prosecutorial miscon-

duct has occurred during the course of a trial does not, in and of itself, require a new trial. *State v. Johnson*, 307 Minn. 501, 509, 239 N.W.2d 239, 244 (1976). Whether a new trial should be granted because of misconduct of the prosecuting attorney is governed by no fixed rules, but rests within the discretion of the trial judge, who is in the best position to appraise its effect. *State v. Wahlberg*, 296 N.W.2d 408, 420 (Minn.1980). The court's determination should be reversed on appeal only where the misconduct, viewed in the light of the whole record, appears to be inexcusable and so serious and prejudicial that defendant's right to a fair trial was denied. *Id.* Sufficiency of evidence to support the conviction is a necessary element in determining whether the prosecutor's final argument was so prejudicial as to constitute grounds for a new trial. *State v. Stufflebean*, 329 N.W.2d 314, 319 (Minn. 1983).

 When read in context, the prosecutor's reference to and depiction of the playing card jack of spades does not constitute misconduct. Rather than an appeal to racism, the reference appears to be a legitimate attempt to illustrate the state's theory that appellant was not the type of person he claimed at trial to be.

The prosecutor's comment that a not-guilty verdict would say that "Grailon Williams wasn't involved in any killing" is more troubling. The reference to Williams' involvement may have been confusing to the jury and was therefore improper. Any confusion, however, was corrected by the trial court's instruction to the jury, which read in part:

If the Defendant aided, advised, hired, or requested the commission of a crime by other persons and the crime was committed, then the Defendant is guilty of that crime. *You are not to concern yourselves with what action, if any, was taken against the other persons.*

(Emphasis added.)

In light of the strong evidence of appellant's guilt, and the trial court's curative instructions, we hold the prosecutor's comment regarding Williams was harmless error.

5. Appellant next contends the evidence before the grand jury was insufficient to support the indictment. White and Braxton did not testify before the grand jury after notifying the prosecution of their intention to exercise their right against self-incrimination. In their absence, Braxton and White's statements to police implicating appellant were read to the grand jury. Minnesota Rule of Criminal Procedure 18.06 provides, in relevant part:

Subd. 1. **Admissibility of Evidence.** An indictment shall be based on evidence that would be admissible at trial, with the following exceptions:

\* \* \* \* \* \*

(5) Written sworn statements of witnesses who for reasons of ill health or for other valid reasons are unable to testify in person shall be admitted, provided that such witnesses or otherwise admissible evidence will be available at the trial to prove the facts stated in the statements.

\* \* \* \* \* \*

Subd. 2. **Evidence Warranting Finding of Indictment.** The grand jury may find an indictment when upon all of the evidence there is probable cause to believe that an offense has been committed and the defendant committed it. Reception of inadmissible evidence shall not be grounds for dismissal of an indictment if there is sufficient admissible evidence to support the indictment.

 Prior to trial, appellant moved to dismiss the indictment, alleging that Braxton and White's statements were inadmissible hearsay and therefore insufficient to support the indictment.[1] The trial court denied appellant's motion, holding appellant had failed to show the statements were inadmissible and the statements were

---

1. We note that Rule 18.06 is not constitutionally mandated. An indictment based entirely upon hearsay does not violate the United States Constitution. *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956).

written sworn statements within Minn.R. Crim.P. 18.06(5). On appeal, appellant again contends the statements were inadmissible and therefore insufficient to support the indictment.

 A grand jury proceeding is not a trial on the merits, and jurors do not determine guilt or innocence, but rather determine if there is probable cause to believe the accused has committed the crime. *State v. Inthavong*, 402 N.W.2d 799, 801 (Minn.1987). The general rule is a presumption of regularity attaches to the indictment, and it is a rare case where an indictment will be invalidated. *Id.*

 It flows from this presumption that a criminal defendant bears a heavy burden when seeking to overturn an indictment. This is especially true where, as here, the challenge is brought after appellant has been found guilty beyond a reasonable doubt following a fair trial. A more appropriate method of challenging an indictment is an appeal before trial on the merits. *See State v. Cermak*, 350 N.W.2d 328, 331 (Minn.1984) (proper method to appeal denial of motion to remove judge is writ of prohibition).

 Appellant failed to prove that Braxton and White's statements would be inadmissible under all circumstances. In fact, White's statement was admitted at trial under Minn.R.Evid. 801(d)(1)(B) as a prior consistent statement. We hold the statements were sufficient to support the indictment and need not reach the issue whether the statements were written sworn statements within 18.06(5).

Appellant's conviction is affirmed.