**STATE of Minnesota, Respondent,**

v.

**Raymond Cortez STEWARD, Appellant.**

No. C3–01–444.

Supreme Court of Minnesota.

June 13, 2002.

Rochelle R. Winn, Assistant State Public Defender, Minneapolis, MN, Petitioner's Attorney.

Michael Hatch, Minnesota Attorney General, Susan Gaertner, Ramsey County Attorney, Jeanne L. Schleh, Assistant Ramsey County Attorney, St Paul, MN, Respondent's Attorney.

## OPINION

ANDERSON, RUSSELL A., Justice.

We review appellant Raymond Cortez Steward's conviction for premeditated first-degree murder for killing Talvous McKinney on July 4, 2000. Appellant argues that the district court abused its discretion by permitting the state to introduce into evidence appellant's gun-shaped jewelry, and further, that he was denied a fair trial because the prosecutor committed misconduct during cross-examination of appellant and during closing argument, using evidence as proof of appellant's bad character. We affirm.

On the evening of July 4, 2000, appellant, Marcus Bradley and Steven Thomas arrived at 711 Sherburne Avenue in St. Paul to visit friends, but upon discovering the friends were not home began talking with neighbors outside celebrating the holiday. Down the street at 715 Sherburne Talvous McKinney was outside his home shooting off fireworks with his brother Frederick and their friend Fernice Olive. Bradley cautioned the group to stop lighting fireworks, explaining that they made appellant nervous because he had been shot two days earlier.[1] Several witnesses testified that Bradley threatened to shoot anyone that lit another firecracker. Appellant confirmed he had been shot by showing his bandages. Refusing to stop shooting the fireworks, Talvous went to his vehicle, took a firecracker out of the trunk, lit it and asked what Bradley was going to do.

An altercation ensued and Talvous struck Bradley. Appellant asked Talvous why he hit Bradley and Talvous told appellant that he (appellant) had nothing to do with it. Thomas returned to appellant's car, and appellant followed with Talvous close behind. Frederick warned Talvous that appellant was going to get a gun, but Talvous said that the situation was not that serious. Appellant leaned in the back door of the car and told Thomas, "We gonna get 'em," and asked for a gun wrapped in a yellow work glove and stuffed in the backseat. Talvous, standing in the street near the car, told appellant he had no beef with him, and held his hands up in the air. Appellant pointed the gun at Talvous and fired from 5 or 6 feet away, hitting Talvous in the chest.[2] Talvous buckled and turned and ran away, and appellant fired several more times in the direction of Talvous and others. A bullet struck Talvous in the back of his right leg and he collapsed. Appellant and Bradley ran away, and Thomas drove away in appellant's vehicle, but was stopped almost immediately by police.[3] The gunshot to

---

1. Appellant sustained two gunshot wounds in an unrelated incident on July 2. He was shot in the left arm and the stomach at a gas station. Appellant's girlfriend testified that the shooter owed appellant money, that appellant "hit" him, and that the shooting was in retaliation. Appellant refused surgery for the wounds and at trial testified on direct examination that he told police that he did not know who shot him because he was not "fond" of the police nor were they "fond" of him.

2. Witnesses testified that appellant wore a brown work glove on the hand holding the gun. Earlier that day appellant, his girlfriend Tessa Samson, Thomas, and Bradley bought brown work gloves. Samson testified that because the men bought the gloves after stating they were "strapped" (armed), she was concerned and asked to be dropped off at her sister's home right away. Appellant testified that the group did not buy work gloves. One yellow work glove was found on the front seat of appellant's car after the shooting.

3. Thomas ultimately pleaded guilty to second-degree murder in exchange for a reduced sentence, and testified for the state at appellant's trial.

Talvous's chest severed his abdominal aorta and he died from the resulting blood loss.

To police on the scene witnesses identified the shooter as "Ooze," appellant's nickname. Police began searching for him, based in part on the description provided by an officer who had stopped appellant, Bradley, Thomas and appellant's girlfriend Tessa Samson in the early morning hours of July 4 for shooting off fireworks on the same block of Sherburne where Talvous was shot. During that encounter a police officer noted that appellant was wearing earrings that resembled Uzi submachine guns. A picture of appellant taken by police that night was introduced into evidence at appellant's trial. In the picture, appellant was wearing the earrings. The jewelry itself was also admitted into evidence.

After the shooting appellant fled to Bradley's girlfriend's apartment. He spoke with Samson and asked her to tell police they had been at a barbecue all day. When appellant told Samson he had not shot anyone she heard people in the background laugh. Appellant's "associate"[4] Cedric Benjamin received a call about appellant and drove to see him. Appellant told Benjamin that he needed a place to stay because he did not want the police to catch him. Benjamin suggested he leave town, but allowed appellant to stay with him that night at a hotel. Later police found one of appellant's Uzi-shaped earrings in the hotel room. The next day appellant took a cab from the hotel to the home of his associate Albert Hill. Appellant asked Hill to cut his hair because he

had a distinctive word ("MOB")[5] shaved in the hair on the back of his head. Police found appellant hiding in Hill's kitchen behind the refrigerator and arrested him. They found another of appellant's Uzi-shaped earrings and an Uzi-shaped ring on a table in Hill's home.

Appellant claimed that he acted in self-defense. He testified that he was shot on July 2 and left the hospital against medical advice with both wounds bandaged. According to appellant the fireworks that Talvous and his friends shot on July 4 made him nervous because they sounded like gunshots, and when Bradley announced that the firecrackers were making appellant nervous, Talvous responded that nobody tells him what to do on his own block. Appellant testified that Talvous and Bradley began to argue. Talvous said "let's show 'em what we's about" and Frederick said "We could bang or we could pistol slang." Talvous went to the trunk of his car, and from experience in the neighborhood appellant worried that Talvous was retrieving a gun. Talvous returned with a firecracker and lit it in front of Bradley before punching him. Appellant testified that he backed up to his car with his hands out in front of him and felt outnumbered, scared and intimidated, and that Talvous and two others followed to the car and Talvous told appellant "It's our mother f___ing block. You all comin' up here startin' that bulls___." Appellant testified that Thomas handed him a gun and he shot at Talvous and then shot aimlessly, but denied wearing a work glove during the shooting. Appellant testified that was

---

4. Benjamin described appellant as an "associate," not a "friend" or "somebody that [he] hung out with socially." Steven Thomas also said appellant was his associate, not his friend. Thomas defined an associate as "[s]omebody I can go to if I had a problem or something."

5. Appellant testified upon direct examination that the letters MOB stood for "[m]oney over bitches."

scared and reacted the way he did because Talvous had gone to his trunk earlier and appellant believed it was to get a gun because of Frederick's "pistol slang" comment, because he had seen Talvous in a gun battle where a young girl was shot and at a dice game where Talvous robbed two other players at gunpoint.

Appellant was found guilty of premeditated first-degree murder, intentional second-degree murder and second-degree felony-murder.[6] He contends that he was denied a fair trial, and on appeal his argument focuses on prosecutorial misconduct, but embedded within that argument is an evidentiary issue, which we address first.

## I.

■ We first examine whether appellant's right to a fair trial was violated because the district court admitted into evidence appellant's Uzi-shaped jewelry.[7] Appellant argues that the jewelry was unconnected to the shooting, that the jewelry was not necessary to identify him as the shooter because most of the witnesses knew appellant prior to the shooting, and that if the purpose of admitting the jewelry was to show that he fled by placing him in the hotel room he stayed in the night of the shooting, simply informing the jury that his jewelry was found would have accomplished that without the prejudicial effect of admitting the gun-shaped jewelry. Appellant cites *State v. Grayson,* 546 N.W.2d 731, 737 (Minn.1996), in which we held that it was an abuse of discretion to admit into evidence defendant's "Malcolm X" hat when the hat had no connection with and played no role in the crime

charged. However, we held that the error was not so prejudicial that it required a new trial. *Id.* at 737–38. Appellant contends that here the true purpose of offering the jewelry as evidence was to characterize him as a gun-loving criminal with an affinity for deadly weapons.

The state argues that the jewelry was properly admitted because it connected appellant to the crime, since appellant was known in the neighborhood for wearing the jewelry. The state argues that it was relevant to prove the identity of the shooter, and further argues that the jewelry's probative value is enhanced because the earrings left at the hotel and at appellant's associate's house show that appellant was trying to avoid identification and apprehension by changing his appearance.

■ The district court has broad discretion in ruling on evidentiary matters and we will not overturn a district court's evidentiary rulings unless appellant shows a clear abuse of discretion and that this abuse resulted in prejudice to him. *State v. Willis,* 559 N.W.2d 693, 698 (Minn.1997). At a minimum, evidence must be relevant to be admissible. *See State v. Harris,* 521 N.W.2d 348, 351 (Minn.1994). Under Minnesota Rule of Evidence 401, relevant evidence is anything that tends to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence. Physical evidence is generally admissible if it connects the defendant to the crime. *See State v. Johnson,* 324 N.W.2d 199, 201 (Minn.1982). However, relevant evidence may be ex-

---

**6.** At sentencing the district court entered a conviction for first-degree murder and dismissed the other charges. Minnesota Statutes § 609.035, subd. 1 (2000) provides that where a person's conduct constitutes more than one offense, that person may be punished for only one of the offenses.

**7.** During his testimony appellant clarified that his earrings actually depicted Tech–9 automatic weapons, not Uzi submachine guns.

cluded if its probative value is substantially outweighed by its likelihood of creating unfair prejudice. Minn. R. Evid. 403.

Here the circumstantial evidence indicates that appellant was wearing the jewelry at the time of the shooting and direct evidence indicates that he discarded it during flight in an effort to conceal his identity. Thus the jewelry helps to identify appellant as the shooter and suggests his consciousness of guilt. The probative value of the jewelry was not substantially outweighed by the likelihood of prejudice, particularly in light of the fact that appellant was known as "Ooze" and known for wearing the jewelry. We hold that the district court did not abuse its discretion by admitting the jewelry.

## II.

We next turn to appellant's argument that the state committed prosecutorial misconduct during appellant's trial. Even if established, prosecutorial misconduct does not in and of itself require a new trial. *State v. Scruggs*, 421 N.W.2d 707, 715–16 (Minn.1988). A conviction should be reversed if the misconduct appears to be inexcusable and so serious and prejudicial that the defendant's right to a fair trial is denied. *State v. Smith*, 541 N.W.2d 584, 588 (Minn.1996). Therefore, we generally will not grant a new trial if the misconduct was harmless beyond a reasonable doubt. *State v. Atkins*, 543 N.W.2d 642, 648 (Minn.1996).

We determine whether prosecutorial misconduct is harmless based in part on the type of misconduct. *State v. Caron*, 300 Minn. 123, 127, 218 N.W.2d 197, 200 (1974). In cases involving unusually serious prosecutorial misconduct, that misconduct will not be characterized as harmless unless there is certainty beyond a reasonable doubt that the misconduct was harmless. *Id.* at 127–28, 218 N.W.2d at 200. In cases involving less serious misconduct, the misconduct will not be characterized as prejudicial unless it is likely that the misconduct played a substantial part in influencing the jury to convict. *Id.*, 218 N.W.2d at 200. Whether a new trial should be granted because of prosecutorial misconduct is governed by no fixed rules but rests within the discretion of the trial judge, who is in the best position to appraise its effect. *Scruggs*, 421 N.W.2d at 716. As a general rule, the right to raise an issue concerning the prosecutor's closing argument is forfeited if the defendant fails to object or seek a cautionary instruction at trial. *State v. Parker*, 353 N.W.2d 122, 127 (Minn.1984).

Appellant argues that the record discloses a pattern of misconduct by the prosecutor that includes the introduction of other bad acts committed by appellant, inadmissible character evidence, and suggestions that the jury draw inferences from facts not in evidence. The state responds that the prosecutor did not commit misconduct and that any overzealousness fell short of the level of conduct that requires a new trial. We analyze each allegation of misconduct in turn.

Appellant's first contention is that during cross-examination the prosecutor improperly introduced evidence of appellant's prior bad acts and bad character. During appellant's direct examination he admitted having two prior convictions for controlled substance offenses. On cross-examination the prosecutor asked several questions regarding the terms of appellant's probation, to which defense counsel objected. The court sustained objections to questions asking whether appellant was prohibited from owning a gun or driving a car, but overruled an objection to a question asking whether appellant was ordered to stay out of the neighborhood where the

shooting occurred.[8] While deliberating the jury asked the district court whether appellant was "currently being restrained from the neighborhood." Appellant argues that this line of questioning effectively introduced evidence of his prior bad acts—crimes that had no material relevance to this case and served to suggest his propensity to commit crimes. The state responds that the questions were proper because they challenged appellant's credibility, at issue because he testified to his mental state at the time of the shooting and his justification for shooting Talvous.

It is unprofessional conduct for the prosecutor to knowingly offer inadmissible evidence in order to bring that evidence to the attention of the judge or jury, ask legally objectionable questions, or make other impermissible comments or arguments in the presence of the jury. *State v. White*, 295 Minn. 217, 223, 203 N.W.2d 852, 857 (1973). However asking a question to which an objection is sustained is not by itself evidence of prosecutorial misconduct. Furthermore the jury must be presumed to have followed the court's instructions and to have disregarded any question to which an objection was sustained. *See State v. James*, 520 N.W.2d 399, 405 (Minn.1994). Even if the questions amount to misconduct, it is at most nonserious misconduct, to which we apply the harmless error analysis applicable to less serious prosecutorial misconduct. *See Caron*, 300 Minn. at 128, 218 N.W.2d at 200. We hold that because it is unlikely the questions played a substantial part in influencing the jury to convict, the questions were harmless, appellant's right to a fair trial was not violated, and a new trial is not warranted.

Appellant next argues that during cross-examination the prosecutor improperly asked him what his nickname Ooze meant. Before trial, the defense moved to prevent the state from speculating about the origins of appellant's nickname Ooze. The court ruled "I don't think we need to have the police officers or anyone else defining the nickname" and the prosecutor told the court that she had no need to inquire about the origins of the nickname.[9]

---

8. During-cross examination of appellant, the following exchange occurred:

Prosecutor: Because of your criminal convictions, you weren't even supposed to have a gun, were you?

Defense Counsel: Objection, irrelevant, Your Honor.

Court: Sustained.

Prosecutor: You're not even supposed to be driving a car, were you?

Defense counsel: Objection, irrelevant.

Court: Sustained.

Prosecutor: And after your last conviction, the judge didn't even want you in the area; in fact, ordered you to stay out of the area around 711 Sherburne, right?

Appellant: No.

Prosecutor: That was one of the rules of your probation, was it not, to stay out of the area bounded by Minnehaha, Dayton, Western, and Victoria?

Defense Counsel: Objection, relevance.

Court: Overruled.

Appellant: On my first, yes, it was; on my second, they ran it concurrent. I was a resident for a long time, so it wasn't no longer an issue. I lived in Frogtown.

Prosecutor: But the area had been a problem for you and you were not supposed to be there, right?

Appellant: I don't understand the question.

Prosecutor: The judge told you that because of the problems you had had in that area, you were to stay out of that area, right?

Appellant: Yes.

9. The state argues that the pretrial discussion regarding soliciting the origins of appellant's nickname did not apply to asking appellant about the nickname; rather the ruling applied only to questions for other witnesses regarding what Ooze meant. On the record the district court said "But in any event I don't think we need to have the police officers or anyone else defining the nickname. They can use it." A few lines later the prosecutor stated "But I don't need to go into why they call

During cross-examination of appellant, the prosecutor asked him what his nickname was and what it stood for. The defense objected to the second question and the district court sustained the objection. Appellant argues that the prosecutor sought to associate appellant's nickname with an Uzi weapon. The state responds that because the objection was sustained, the jury never heard what the nickname meant, and furthermore even without the question, the jury was free to draw its own inference about the origins of his nickname. The court's ruling that "anyone else" besides police officers should not define the nickname indicates the prosecutor's question was improper. We hold that in the context of the repeated use of the nickname and the evidence of Uzi-shaped jewelry, the improper question about the nickname's meaning does not amount to serious misconduct, and thus we apply the harmless error analysis for less serious misconduct. In light of the jury instruction to disregard questions to which an objection was sustained, it is unlikely the question about the nickname played a substantial part in influencing the jury to convict, and thus the error was harmless, appellant's right to a fair trial was not violated, and a new trial is not warranted.

Appellant next argues that the cumulative effect of irrelevant and inflammatory arguments about the bad character of appellant and his associate during closing argument served to divert the jury's attention from his guilt or innocence. He argues that during the state's closing argument the prosecutor sought to discredit appellant and illustrate appellant's bad character via a guilt-by-association attack on the character of Cedric Benjamin, an associate of appellant's and a witness for the state prosecutor:

> There's also the father figure, Cedric Benjamin. That's the defendant, Raymond Steward's term for Benjamin, a father figure. Now, [defense counsel] made a lot about the fact that Cedric Benjamin is under federal indictment for some big drug deal. Cedric Benjamin told you that he has convictions for things such as possession of a gun in a schoolyard, possession of a gun by an ineligible person, and yet this is the type of father figure that Raymond Steward picked. What kind of father figure is that? * * * Cedric Benjamin was the kind of man who, when you were in trouble, and needed something when you were in trouble from committing a crime, Cedric Benjamin could help you out. He's not so much a father figure as a godfather.

Appellant also argues that during closing argument the prosecutor established a theme of appellant's bad character based on appellant's "Law of Retribution and Retaliation," his attitude towards women, and his ideas about masculinity. The closing argument began with the following statement:

> There's Ooze's world and there's Ooze's law. And thank God most of us don't live by Ooze's law, because Ooze's law is based on retaliation, it's based on retribution, and it causes pain and it causes suffering. That's not the real world and that's not real justice. I'm going to talk to you first about Ooze's law and Ooze's rules, and then I'm going to talk to you about the law that applies in this case.

Subsequently the prosecutor returned to this theme, arguing for instance, "Now, in Ooze's world there are certain rules, too;

---

him that." The court replied "That's my point. Whatever they think his street name

might be."

in fact Ooze's world is all one big game of Ooze says. * * * [A]nd if you violate Ooze's law you find out what happens." The prosecutor also connected appellant's gunshot injuries to the theme: "Bloated understood Ooze's law of retribution, of retaliation, that's why he shot Raymond Steward." [10] The prosecutor also argued that because appellant had the word MOB shaved in the back of his hair, that his attitude toward women was negative: "Women apparently are bit players in Ooze's world. His hairstyle said it all: Money over bitches. That's what he thinks of women in his world." The prosecutor also speculated about appellant's idea of masculinity, arguing for instance:

> In Oozes's world, there's another rule: Never show weakness. Ooze's world is a manly man's kind of place. Best evidence of that, Raymond Steward gets shot on July 2nd, he goes to the hospital, the doctors say, "We want to take the bullet out of you." But only a sissy would have that done. A manly man would wear that like a badge of honor, and that's what Raymond Steward did. He's proud to have that, it shows how tough he is, how strong he is.

Appellant argues that the prosecutor's closing argument sought to inflame the jury's prejudice by making allegations outside of the record and influence the jury by using improper character evidence. The state responds that in linking together facts adduced at trial, the prosecutor sought to prove appellant's version of the facts was not credible, and that his actions failed to satisfy the legal requirements of self-defense in Minnesota.

We are concerned that prosecutors not attempt to bolster evidence by characterizing the accused as a person who would commit the offense charged, thereby violating our rule against using evidence of a person's character to prove action in conformity therewith. *See* Minn. R. Evid. 404. However, as a general rule, the right to raise an issue concerning the prosecutor's closing argument is waived if the defendant fails to object or seek a cautionary instruction at trial. *Parker,* 353 N.W.2d at 127. Of the statements appellant now complains of, he objected to none of them at trial and therefore failed to preserve the issue for appellate review.[11] We hold that by failing to object at trial to the portions of the closing argument now objected to and failing to seek specific cautionary instructions, appellant is deemed to have forfeited his right to have the issue considered on appeal. *See State v. Gunn,* 299 N.W.2d 137, 138 (Minn.1980).

While we need not address appellant's allegations of prosecutorial misconduct during closing argument in light of appellant's failure to preserve the issue, we may reverse a conviction if we deem an error sufficient to do so. *Id.* However we do not believe this case justifies a reversal. Appellant's own theory of the case invited the theme "Ooze's world" in the state's closing argument. Notably, in the second sentence of his opening statement, appellant's attorney introduced the idea of appellant living in a "different world" to es-

---

10. "Bloated" was the street name of the man who shot appellant on July 2.

11. Appellant contended at oral argument that because he made a motion in limine regarding the use of his nickname and to exclude the jewelry from evidence, the issue of whether the prosecutor committed misconduct by characterizing him as a criminal was preserved for appellate review. We disagree. Because we do not have an adequate record of the motions made pre-trial, and because the subject of those motions could not have related directly to the theme of the state's closing argument, we conclude that the issue was not preserved for appeal by appellant's motions in limine.

tablish the reasonableness of appellant's actions: "Defense in this case will show that [appellant] as well as many of the other principals in this case inhabit a world that is far different than the world in which you and I live. It's a world based on loose relationships, temporary allegiances and shifting alliances." Rather than impermissibly attacking appellant's character, the prosecutor's "Ooze's Law" theme, in context, can be seen as refuting appellant's self-defense theory that he acted reasonably under the circumstances. Furthermore, even if the prosecutor's "Ooze's Law" theme constitutes misconduct, it does not amount to serious prosecutorial misconduct and any likelihood that the theme played a substantial part in influencing the jury to convict was substantially diluted by the defense theory. *See Caron,* 300 Minn. at 127–28, 218 N.W.2d at 200. Likewise the prosecutor's references to appellant's attitude toward women, while irrelevant and improper, do not constitute serious misconduct in light of appellant's testimony on direct examination that the letters shaved into his hair stood for "money over bitches." Any likelihood that the prosecutor's error played a substantial part in influencing the jury to convict was substantially diluted by this testimony. The prosecutor's references to appellant's associate Cedric Benjamin should have been restricted to Benjamin's role in appellant's flight from apprehension, and the references to Benjamin as a "godfather" were improper as an attempt to paint appellant as the type of person who would choose a convicted felon as a father figure. The references may have illustrated that appellant showed poor judgment in choosing associates, but do not amount to serious prosecutorial misconduct and the likelihood that the error played a substantial part in influencing the jury to convict was minimal. Thus, even overlooking appellant's failure to preserve

the issue, cumulatively the errors in the state's closing argument do not amount to the type of prosecutorial misconduct that warrants a new trial.

Affirmed.