McKeig, Justice.
Joseph Christen Thoresen was convicted of first-degree premeditated murder and sentenced to life in prison without the possibility of release. On direct appeal, Thoresen raises two issues. First, he argues that his conviction was based on uncorroborated accomplice testimony in violation of Minn. Stat. § 634.04 (2018). Second, he argues that the district court abused its discretion in denying his request for jury instructions regarding the credibility of drug users and uncharged accessories after the fact. We hold that the accomplice testimony was sufficiently corroborated and the district court did not abuse its discretion in denying the requested jury instructions. We therefore affirm.
FACTS
On June 21, 2016, David Haiman was killed on a remote trail in Itasca County. Following a police investigation, Thoresen was charged with several offenses, including *549 first-degree premeditated murder. Minn. Stat. § 609.185(a)(1) (2018). His alleged accomplice, Kayleene Greniger, pleaded guilty to second-degree intentional murder and was sentenced to 30 years in prison. As a condition of her plea agreement, Greniger testified against Thoresen at his jury trial.
According to Greniger, she and Thoresen were romantically involved and lived together in Grand Rapids when the victim was killed. On June 20, 2016, she and Thoresen smoked methamphetamine and marijuana, drank alcohol, and used cocaine with Haiman at their apartment. Thoresen, who was more than 6 feet tall and weighed about 200 pounds, "aggressive[ly]" told Haiman, who was 5 feet, 5 inches tall and weighed about 180 pounds, that they needed to talk in the bedroom. Greniger, who is about 4 feet, 11 inches tall and weighed about 100 pounds, went to the bedroom with them. After they entered the bedroom, Thoresen and Greniger tied Haiman to a chair and repeatedly hit him.
Lending support to Greniger's testimony about the assault she and Thoresen committed against Haiman in their apartment, a witness, J.D., testified that she observed that Haiman had multiple injuries that were consistent with being tied up and beaten. More specifically, Haiman told J.D. that Thoresen and Greniger had tied him up and would not let him go to work. Another witness, J.G., testified that he saw Thoresen throw Haiman up against the wall and later saw Haiman tied to a chair and lying on the floor of the bedroom. Another witness testified that he saw blood splatter on Thoresen's pants.
Greniger testified that while Haiman remained bound to the chair, Thoresen removed Haiman's keys and phone from his pocket and took his car, leaving Haiman tied up.[1] Hours later, Thoresen untied Haiman and escorted him to Haiman's car, a maroon two-door sedan. When Greniger joined them a few minutes later, she saw Thoresen's machete between the driver's-side door and the seat. Thoresen's friend, R.G., testified that Thoresen and Greniger came to his house with a man who remained in the back seat of the "maroon" car they drove. Thoresen told R.G. that Thoresen "was looking for something to use to put a farm animal down that was injured and couldn't be saved." R.G. understood that to mean that Thoresen was going to kill a farm animal, but he did not see any farm animals with Thoresen and Greniger that day.
According to Greniger's testimony, Haiman sat in the back seat as Thoresen then drove the trio to J.D.'s house, where they used more methamphetamine. There, Greniger and Thoresen took J.D.'s four-wheeler out for a ride on J.D.'s property, leaving Haiman and J.D. behind. Greniger testified that there was a baseball bat on the back of the four-wheeler. During their ride, Thoresen stopped, turned the four-wheeler off, and told Greniger that they were going to kill Haiman. Consistent with Greniger's testimony, J.D. told the jury that Greniger and Thoresen drove her four-wheeler around the property. Because J.D. was not watching closely, she admitted that she did not know whether they stopped during the ride. Thoresen and Greniger returned to J.D.'s house after the four-wheeler ride and consumed more methamphetamine with J.D. and Haiman. Greniger saw Thoresen grab two knives from J.D.'s house as they left and put them in Greniger's purse. She also saw the *550 baseball bat in the car next to the machete.
Greniger testified that with Thoresen driving and Haiman in the back seat, they next drove down a "trail in the woods," hit a puddle of mud, and the car started steaming. Thoresen stopped the car and told Haiman to check the oil. Greniger let Haiman out on the passenger side of the two-door sedan and put her head down to start rolling a cigarette. Greniger testified that Thoresen, meanwhile, got out of the driver's side with a baseball bat in his hand, walked to the front of the car, and hit Haiman on the head twice, knocking him to the ground. Greniger grabbed the knives from her purse, and Thoresen and Greniger stabbed Haiman multiple times. Greniger then cut off Haiman's head with the machete. Thoresen grabbed Haiman's body by the ankles and dragged it into the woods. He stuck a knife in Haiman's temple, placed the head in a bag, and threw the bag into the woods.
A friend of Thoresen's, T.C., provided support for some of Greniger's testimony about the events in the woods. Greniger testified that, after the murder, she and Thoresen drove to T.C.'s house in Haiman's car. T.C. verified that Thoresen drove a red sedan to his house. Thoresen told T.C. that the car belonged to "a kid" whom Thoresen "had hit ... in the head with a bat twice" and whose head he had cut off with a machete. T.C. also testified that he saw a bat among Thoresen and Greniger's things when they came to his house. Later, T.C. found a bat in his yard with a large red stain on it that he presumed to be blood and burned it out of concern that it could implicate him in the murder. Investigators also found a partially burnt knife near T.C.'s fire pit.
When investigators later visited the apartment of Greniger and Thoresen, Greniger brought them to the area where Haiman's body was. Though investigators did not find Haiman's body until a few days later, Greniger had brought them to within 30 yards of the remains. Haiman's head was on the north side of the trail, and his body was on the south side of the trail, about 150 feet from his head. The medical examiner testified that there was a large fracture on the side of Haiman's head that would have caused "significant" brain damage. His clothing had holes in it that appeared to be from stabbing, but the body had decomposed too much to verify whether there were stab wounds.
Investigators also searched the apartment that Thoresen and Greniger shared. There, investigators found evidence that corroborated Greniger's testimony. Specifically, they observed multiple areas with blood stains. They found a number of items that appeared to contain blood stains, including a pair of black tennis shoes, two pairs of jeans, a pink towel, and a rope. Investigators also found a machete with blood stains on the blade between the mattress and the box spring of the bed in the apartment. DNA on the machete's handle did not match Thoresen's DNA, but Greniger and Haiman could not be excluded as matches. Greniger's fingerprint was on the machete.
Investigators also searched Haiman's car. They found a fillet knife, which had blood on the blade, in the trunk, and blood stains on the outside of the car, near the passenger side door. The blood on the knife and car matched Haiman's DNA. Thoresen and T.C. were eventually arrested after they fled from a police officer while driving Haiman's maroon car. Thoresen was released, but that arrest led investigators to look into his connection to Haiman's disappearance. Thoresen was eventually arrested and charged for his role in Haiman's death.
*551 Before trial, Thoresen requested jury instructions about the credibility of addict or substance abuser testimony and the credibility of accessory-after-the-fact testimony. The State opposed both instructions, and the district court denied Thoresen's requests. Multiple witnesses, including Greniger, J.D., T.C., and J.G., admitted to being under the influence of drugs or alcohol during events that they testified to and that those substances affected their memory or perception. T.C. admitted to destroying evidence and acknowledged that he hoped his cooperation with the prosecutor would help him avoid prosecution. The court instructed the jury both before and after testimony about the role of the jury in considering and weighing the credibility of testimony.
The jury found Thoresen guilty of first-degree premeditated murder, as a principal and as an aider and abettor. See Minn. Stat. § 609.185(a)(1).[2] The district court entered a conviction on principal liability for first-degree premeditated murder and sentenced him to life in prison without the possibility of release.
This appeal follows.
ANALYSIS
On appeal, Thoresen argues that the testimony of his accomplice-Greniger-was not sufficiently corroborated, and so his conviction must be reversed. He also argues that he is entitled to a new trial because the district court erred in its jury instructions. We consider each issue in turn.
I.
We first consider Thoresen's argument that his conviction of first-degree premeditated murder violates Minn. Stat. § 634.04 (2018), which provides in relevant part that "[a] conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense." This statute is satisfied "if the corroborative evidence in some substantial degree tends to affirm the truth of [the accomplice] testimony and to point to the guilt of the defendant." State v. Rasmussen , 241 Minn. 310, 63 N.W.2d 1, 3 (1954). In reviewing the sufficiency of corroborating evidence, we view the evidence "in the light most favorable to the prosecution, and with all conflicts in the evidence resolved in favor of the verdict." State v. Nelson , 632 N.W.2d 193, 202 (Minn. 2001).
According to Thoresen, the evidence presented at trial did not in some substantial degree tend to affirm the truth of Greniger's accomplice testimony because she lied to the police and the grand jury. He also contends the evidence presented at trial did not in some substantial degree tend to point to his guilt because there was no independent evidence of premeditation. We disagree.
The corroborative evidence must in some substantial degree tend to affirm the truth of the accomplice testimony because the testimony of an accomplice is considered inherently untrustworthy, primarily for the reason that the accomplice may testify against a defendant in the hope of obtaining clemency. State v. Sorg , 275 Minn. 1, 144 N.W.2d 783, 786 (1966). Corroborative evidence may be circumstantial *552 or direct. State v. Adams , 295 N.W.2d 527, 533 (Minn. 1980). The quantum of corroboration necessary is a fact-specific inquiry because it must "restore[ ] confidence in the accomplice's testimony," State v. Scruggs , 421 N.W.2d 707, 713 (Minn. 1988), given that accomplice testimony is "inherently untrustworthy." Sorg , 144 N.W.2d at 786.
When the evidence presented at trial is viewed in a light most favorable to the prosecution, it restores our confidence in the truth of Greniger's accomplice testimony. J.G. corroborated Greniger's accounting of the hours leading up to the murder when he testified that he saw Thoresen throw Haiman up against the wall and later saw Haiman tied to a chair and lying on the floor of the bedroom. J.D. corroborated Greniger's account of the beating Thoresen gave Haiman in their apartment, when she testified that she observed that Haiman had multiple injuries that were consistent with being tied up and beaten. J.D. also corroborated the ride Greniger and Thoresen took on her four-wheeler. T.C. corroborated Greniger's testimony that some of the murder weapons-a bat and a knife-were in the car that Thoresen was driving. Thoresen told T.C. that he hit "a kid" over the head with a baseball bat, then cut his head off. T.C. also testified that Greniger became upset with Thoresen for telling people about what they planned and did together. Finally, the autopsy and forensic evidence corroborated Greniger's testimony that Thoresen struck Haiman in the head with a baseball bat and then stabbed him with a knife.
Although the corroborative evidence must in some substantial degree tend to point to the defendant's guilt, it need not "establish a prima facie case of the defendant's guilt." Scruggs , 421 N.W.2d at 713 (quoting Adams , 295 N.W.2d at 533 ). "The entire conduct of the accused may be looked to for corroborating circumstances, and if from those circumstances the connection of the accused with the crime may fairly be inferred, the corroboration is sufficient." Rasmussen , 63 N.W.2d at 3. The crime at issue here is first-degree premeditated murder. Premeditation requires that the defendant "consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Minn. Stat. § 609.18 (2018). "[A]n inference of premeditation may be supported by several categories of evidence, including planning activity, motive, the nature of the killing, and a defendant's actions following the killing." State v. Petersen , 910 N.W.2d 1, 7 (Minn. 2018) (citation omitted).
Beyond Greniger's testimony, there is independent evidence that Thoresen planned to kill Haiman. R.G. testified that Thoresen said he needed to put down a large farm animal, and R.G. understood that to mean that Thoresen was going to kill a large animal. R.G. did not see any farm animals, but he did see Haiman in the back seat of the car that Greniger and Thoresen arrived in. J.D. testified that the victim said Thoresen and Greniger would not let him leave to go to work. Thoresen drove Haiman and Greniger to an isolated area, and immediately after the murder, Thoresen hid the victim's body and head. T.C. testified that Greniger yelled at Thoresen for telling T.C. about what they did after they had planned the murder together. Thoresen continued driving the victim's car around until he was arrested. When this evidence is viewed in a light most favorable to the prosecution, we conclude that it points to Thoresen's guilt in some substantial degree.
In sum, Thoresen's premeditated murder conviction does not violate Minn. Stat. § 634.04 because the corroborative evidence tends to affirm the truth of Greniger's *553 accomplice testimony and to point to Thoresen's guilt.
II.
Next, we turn to Thoresen's argument that the district court abused its discretion when it denied his request to instruct the jury about the credibility of drug users or witnesses who could later be charged as accessories after the fact. We review the district court's decision on jury instructions for an abuse of discretion. State v. Mahkuk , 736 N.W.2d 675, 682 (Minn. 2007). An abuse of discretion occurs when a decision as to whether to give an instruction "is based on an erroneous view of the law or is against logic and the facts in the record." State v. Guzman , 892 N.W.2d 801, 810 (Minn. 2017).
A.
We first address Thoresen's request for a jury instruction about the credibility of witnesses who were using or addicted to drugs. Thoresen requested that the district court give the following instruction:
Evidence was introduced during the trial that (name of witness/witnesses) were (using drugs)(addicted to drugs)(abusing drugs) when these events took place. There is nothing improper about calling such a witness to testify about events within his or her personal knowledge.
On the other hand, this testimony must be considered with care and caution. The testimony of a witness who (describe circumstances) may be less believable because of the effect the drugs may have on his or her ability to perceive, remember, or relate the events in question.
After considering this testimony in light of all the evidence in this case, you may give it whatever weight, if any, you find it deserves.
The district court denied Thoresen's request and gave the following instruction before the jury deliberated:
You are the sole judges of whether a witness is to be believed and of the weight to be given a witness's testimony. There are no hard and fast rules to guide you in this respect. In determining believability and weight of testimony you may take into consideration the witness's interest or lack of interest in the outcome of the case , relationship to the parties, ability and opportunity to know, remember, and relate the facts , manner, age and experience, frankness and sincerity or lack thereof, reasonableness or unreasonableness of their testimony in the light of all the other evidence in the case, evidence of a statement by or conduct of the witness on some prior occasion that is inconsistent with present testimony.
(Emphasis added.) Before testimony began, the district court gave a similar instruction, advising that the jury should consider all factors that weigh on believability.
We previously considered the question of a substance-abuse-related jury instruction in State v. Daniels , 361 N.W.2d 819, 832 (Minn. 1985). Like here, the district court in Daniels instructed the jurors before and after testimony to use their own judgment and common sense and to consider whether other factors-including the ability of witnesses to know, remember, and relate the facts-affected the witnesses' credibility. Id. We also noted in Daniels that the defendant's attorney discussed the witnesses' drug use when addressing the jury. We held that the district court did not abuse its discretion because the jury received "ample instruction on credibility." Id.
Thoresen argues that Daniels is distinguishable from this case because here *554 nearly every lay witness was using drugs during the events they described to the jury. In contrast, multiple witnesses in the Daniels trial, including eyewitnesses, were not under the influence of drugs. 361 N.W.2d at 823-26. This is not a legally meaningful difference. In fact, the impact of the witnesses' drug use on their ability to observe and understand Thoresen's actions was more fully developed in this case, not only through the district court's credibility instruction but also on cross-examination by defense counsel and in closing arguments by both the state and the defense.
Ultimately, the district court did not abuse its discretion in rejecting Thoresen's proposed jury instruction on addict or drug user testimony because the substance of the requested instruction was included in the jury instructions given to the jury. State v. Swanson , 707 N.W.2d 645, 653 (Minn. 2006). The district court included the directive to consider the witnesses' "ability and opportunity to know, remember, and relate the facts." Because the jury heard testimony that witnesses had used mind-altering substances, it was able to consider the effect of these substances on the reliability of the witnesses' testimony.[3]
B.
Thoresen also requested that the district court include an instruction about the potential for T.C. to be charged as an accessory after the fact. The proposed instruction said "[w]hether his testimony may have been influenced by his desire to please the State or to strike a good bargain with the State about his own situation is for you to determine."
We hold that the district court did not abuse its discretion for two reasons. First, the court twice instructed the jurors to consider whether a witness had an interest in the outcome of the case. "If the substance of an instruction is already contained in the jury instructions, a court need not give the requested instruction." Swanson , 707 N.W.2d at 653. Second, we have previously upheld the denial of requests for similar instructions, and we do so again, here. Id. ; see also State v. Yang , 774 N.W.2d 539, 559 (Minn. 2009) ; State v. LaJambe , 300 Minn. 539, 219 N.W.2d 917, 919 (1974) (rejecting an instruction that the "testimony of an accomplice is considered inherently untrustworthy, primarily for the reason that he may testify against defendant in the hope of obtaining clemency for himself").
We therefore hold that the district court did not abuse its discretion in denying Thoresen's request for a jury instruction on credibility of an uncharged accessory after the fact.
*555 CONCLUSION
For the foregoing reasons, we affirm the judgment of conviction.

Greniger testified that she and Thoresen went to a gas station, a casino, and a friend's house during that time. Witnesses corroborated that Greniger and Thoresen did go to a friend's house and the casino.

The jury also found Thoresen guilty of first-degree murder while committing a kidnapping, as a principal and as an aider and abettor. See Minn. Stat. § 609.185(a)(3). The jury found Thoresen not guilty of second-degree intentional murder and second-degree unintentional murder while committing a second-degree assault. See Minn. Stat. §§ 609.19, subds. 1(1), 2(1) (2018).

Thoresen urges us to adopt an Eighth Circuit rule that a jury instruction on drug or alcohol use may be appropriate when considering the testimony of addicts. United States v. Hoppe , 645 F.2d 630, 633 (8th Cir. 1981) ; see also United State v. Johnson , 848 F.2d 904, 906 (8th Cir. 1988). Under the Eighth Circuit rule, courts should consider whether any of the following factors are present: "a dispute as to whether the informant is actually an addict; cross-examination concerning the informant's addiction; an instruction alerting the jury that an informant's testimony should be viewed with care; and corroboration of the informant's testimony." Hoppe , 645 F.2d at 633 (citations omitted). We need not and do not decide whether to adopt this rule because in this case it was not an abuse of discretion for the district court to deny Thoresen's requested jury instructions. Further, Hoppe considered the testimony of informants who had addictions, but here no witnesses were informants. Moreover, application of the Eighth Circuit's rule here would not have changed the outcome because the factors from the rule would have weighed against giving the instruction.